604 F.2d 1281
 The SUPERIOR OIL COMPANY, a Nevada Corporation, Plaintiff-Appellant,
v.
WESTERN SLOPE GAS COMPANY, a Colorado Corporation,
Defendant-Appellee.
CONTINENTAL OIL COMPANY, a Delaware Corporation, Plaintiff-Appellant,
v.
WESTERN SLOPE GAS COMPANY, a Colorado Corporation, Defendant-Appellee.
 Nos. 77-1806, 77-1807.
 United States Court of Appeals,
Tenth Circuit.
 Argued March 13, 1979.
Decided Aug. 13, 1979.
Rehearing Denied Sept. 27, 1979.
 
 Robert C. Hawley, Denver, Colo. (Gretchen A. VanderWerf, Ireland, Stapleton, Pryor & Holmes, Denver, Colo., on brief), for plaintiffs-appellants Superior Oil Co. and Continental Oil Co.
 W. B. Wagner, Jr., Patrick F. Timmons, Houston, Tex., on brief, for plaintiff-appellant Superior Oil Co.
 Tom Burton, Joseph C. Johnston, Houston, Tex., on brief, for plaintiff-appellant Continental Oil Co.
 James R. McCotter, Denver, Colo. (Richard W. Bryans, Kelly, Stansfield & O'Donnell, Denver, Colo., on brief), for defendant-appellee Western Slope Gas Co.
 Thomas L. Barton, Thomas M. Blume, Dale A. Mayer, Darryl L. Harvey, Denver, Colo., for amicus Phillips Petroleum Co.
 Before McWILLIAMS and BARRETT, Circuit Judges, and MILLER,* Judge.
 MILLER, Judge.
 These appeals are from separate orders of the district court granting summary judgment in favor of defendant-appellee Western Slope Gas Company ("Western Slope"). The judgment against Superior Oil Company ("Superior") was entered pursuant to Western Slope's motion for summary judgment. The judgment against Continental Oil Company ("Conoco") was entered on the court's joinder of the cases for the purposes of said motion and on its determination that the grant of summary judgment against Superior was decisive of the issues raised in the Conoco case. The orders are vacated, and the cases are remanded.
 
 Background
 
 1
 It appears that the issues before this court in the two cases are, in all material respects, identical. Accordingly, we will direct our attention to only the Superior case,[1] with the understanding that the discussion and disposition of that case also apply to the Conoco case.
 
 
 2
 On January 3, 1964,[2] a 20-year contract for the intrastate (in Colorado) sale and purchase of natural gas was entered into by Western Slope, the "Buyer," and Superior and Conoco, collectively referred to as "Seller." The contract includes provisions relating to heating value, delivery pressure at the wellhead, measurement (unit of measurement is 1,000 cubic feet ("MCF") of gas at base temperature of 60 degrees Fahrenheit and pressure of 15.025 pounds per square inch absolute), specific gravity, deviation from Boyle's Law, and degree of purity.
 
 
 3
 The contract states that, subject to adjustment for differences in heating value, the base price for deliveries prior to August 17, 1967, is 13cents per MCF, 14cents per MCF for the next five years, with a 1cents per MCF increase for each five years thereafter. However, Article 8.4 ("FAVORED NATIONS CLAUSE "), provides, in pertinent part, as follows:
 
 
 4
 If, at any time during the term of this Agreement, Buyer pays to a producer of natural gas in Mesa, Garfield and Rio Blanco County, Colorado, for the purpose of reselling such gas in its Colorado market area, a price per MCF higher than that being paid to Seller hereunder, due consideration being given to the quality of the gas, bases of measurement, delivery pressure, and Other conditions of sale, Buyer shall, commencing upon the date of the first delivery of such natural gas at such higher price, and continuing so long as such higher price is paid for such gas, increase the price being paid to Seller hereunder to equal such higher prices. . . . (Emphasis supplied.)
 
 
 5
 Thus, as the district court found, "A favored nations clause ensures that the seller receives the highest price paid by the buyer . . . to any other seller in a specified area For a substantially similar product." (Emphasis supplied.)
 
 
 6
 Article 7.1 ("INTRASTATE UTILIZATION "), provides in pertinent part as follows:Buyer represents that it is engaged solely in intrastate transportation of natural gas within the State of Colorado and represents that gas purchased hereunder shall be sold and used only in connection therewith. In the event Buyer should, at any time, propose to sell or use gas purchased hereunder in such manner that in Buyer's good faith judgment will subject Seller to the jurisdiction of the Federal Power Commission or any successor body thereto with respect to the sale made hereby, Buyer shall notify Seller at least ninety (90) days before such resale or other disposition is commenced and Seller shall have the right hereunder, upon thirty (30) days' notice to Buyer to terminate this Agreement. . . .
 
 
 7
 Subsequent to the district court's orders dated July 29, 1977, the functions vested in the Federal Power Commission ("FPC") were transferred to the Secretary of Energy under 42 U.S.C. § 7151(b).
 
 
 8
 Under date of October 24, 1972, and regarding the contract of January 3, 1964, Western Slope wrote to Superior as follows:
 
 
 9
 With reference to the gas we are currently purchasing from you under the above gas purchase agreement, Article 8.4 provides that in the event Western pays a higher price to others under certain conditions, you shall be entitled to an equivalent price. We have analyzed the applicable conditions and have concluded that Western has commenced paying a higher price to which you are entitled under the above Article.
 
 
 10
 The price that Western is paying is the ceiling rate as set forth in FPC Order 435. . . . The price is subject to the terms and conditions of the FPC Order which provides for appropriate discounts from the ceiling rate for water content, inert gas, delivery pressure and BTU content. The applicable ceiling rate is 23.75cents per MCF at 15.025 psia. . . .
 
 
 11
 As a result of the above, the average price to be paid by Western under our gas purchase agreement is 23.75cents per MCF. The effective date for payment of the above price is November 14, 1971, subject to the conditions hereinafter stated. Western will continue to pay this price for so long as it pays an Equivalent price to another as provided in Article 8.4. The price is subject to change in the event that (a) the quality or Conditions of delivery of the gas we are receiving from you changes; or (b) FPC Order No. 435 is declared to be invalid or is modified by subsequent FPC Orders. . . . (Emphasis supplied.)
 
 
 12
 This appears to have been the first time that the favored nations clause was triggered. Particularly to be noted is that FPC Order 435 applied to gas sold under contracts dated on or after June 17, 1970. Even though the contract with Superior was dated January 3, 1964, Western Slope considered that its payment of 23.75cents per MCF to another producer triggered Article 8.4.
 
 
 13
 A similar letter, dated May 30, 1974, from Western Slope to Superior advised that on May 15, 1974, Western Slope commenced paying a higher price to which Superior was entitled, namely: 35cents per MCF. The letter stated:
 
 
 14
 Western will continue to pay this price for so long as it pays an Equivalent price to another as provided in Article 8.4. The price is subject to change in the event that the quality or Conditions of delivery of the gas we are receiving from you changes. ([3] (Emphasis supplied.)
 
 
 15
 We note that the higher price that Western Slope had begun paying on May 15, 1974, was under a contract with another producer which provided for a price of 35cents per MCF for gas delivered From wells drilled on or after January 1, 1973. On June 5, 1974, Western Slope received gas under another contract also providing a base price of 35cents per MCF (without regard to vintage).
 
 
 16
 About this time, Western Slope began including in new contracts with intrastate producers an "F.P.C. price protection clause," which provides an alternative ("which results in the greater price to Seller") to the base price. Such a clause typically reads:[4]
 
 
 17
 The price established from time to time by the Federal Power Commission (or any successor agency) as the area ceiling price or rate so authorized, for the specific area within which subject gas well or wells are located, subject to the same general terms and conditions as applicable to such base price which shall include any vintage dates specified by the Federal Power Commission.
 
 
 18
 "Vintage dates" relate to dates when wells are drilled, with gas from older wells being priced lower than gas from recently drilled wells. Thus, an "F.P.C. price protection clause" is designed to incorporate FPC price regulations into intrastate contracts.
 
 
 19
 By letter to Western Slope dated February 21, 1975, Superior complained that Western Slope had advised that it was entitled to a price of only 45cents per MCF (note 3, Supra ), whereas Western Slope was paying a price for gas within the favored nations area which was equal to that prescribed by the Federal Power Commission in Opinion No. 699, June 21, 1974 (50cents per MCF). Western Slope replied on February 27, 1975, that the contract under which it was paying the higher price called for the same price as that for interstate gas from wells connected after January 1, 1973; further, that:
 
 
 20
 (W)e have been advised that the vintage date provisions as established by the F.P.C. and which have been incorporated into our more recent gas supply contracts are legitimate conditions of sale and apply equally to those contracts and To contracts containing Favored Nations clauses. (Emphasis supplied.)
 
 
 21
 Superior wrote back on March 11, 1975, stating:
 
 
 22
 We call your attention to that certain letter directed to Superior from your company dated October 24, 1972 (Supra ) advising us that we were entitled to receive a price equivalent to that under Federal Power Commission Order No. 435 by virtue of the Favored Nations provision in our contract. As you know, Order 435 applied to gas sold under contracts dated on or after June 12, 1970. Since our contract is dated January 3, 1964 if vintaging had in fact been applicable in order to distinguish between contract dates or well commencement dates it would have followed that the price increase prescribed under Order 435 would have had no application to gas produced under our contract. However, this was not the case as was evidenced by your letter advising of that particular rate increase. Therefore, it would seem inconsistent with the position that Western Slope is taking which attempts to restrict the Opinion 699 price only to gas produced from wells commenced after January 1, 1973.
 
 
 23
 Western Slope's response on March 25, 1975, rejecting Superior's position, included the following:
 
 
 24
 In reference to F.P.C. Opinion 435, Docket Nos. R-389 and R-389A and in relation to our letter dated October 24, 1972, Western made a business decision at that time to increase our favored nations contracts to the price specified by Opinion 435 regardless of the contract date mentioned in said Opinion. At that time, contract dates were not considered to be an important factor in future F.P.C. Dockets. As we were obligated to pay this price to other contracts which contained F.P.C. price protection clauses, this price was then paid to all favored nations contracts. At that time, it was indicated that the rulemaking proceedings in Docket Nos. R-389 and R-389A would remain in effect and would be subject to additional requirements, restrictions and authorizations until such time as the Commission declared other just and reasonable rates in the Rocky Mountain Area.
 
 
 25
 As Opinion 435 set rates for the Rocky Mountain Area for sales under contracts dated after June 17, 1970 and knowing that further proceedings might become effective regarding rates and dates, we decided to go ahead and pay all our favored nations contracts based upon this information and Opinion until such time as further proceedings would set such rates in the Rocky Mountain Area. Further proceedings were consequently held and as a result, Opinion 658 was issued on April 11, 1973, revising the initial rates for the Rocky Mountain Area. This Opinion set out new rates for the Rocky Mountain Area for gas sold under contracts dated prior to October 1, 1968 and produced from wells commenced on or before December 31, 1972. At that time we made a decision that Opinion 658 established vintaging as a requirement for the prices provided for and at that time Western reviewed all contracts containing F.P.C. price protection clauses to determine the effect of Opinion 658. Western did not have any contracts that were affected by that Opinion, and did not change any favored nations contracts.
 
 
 26
 Subsequent to Opinion 658, Western has been consistent with all of its Sellers in regard to pricing and vintaging as specified by F.P.C. ([5]
 
 
 27
 Superior filed its complaint against Western Slope on September 3, 1976, alleging failure to pay the full contract price for gas purchased by Western Slope from Superior according to Article 8.4 (FAVORED NATIONS CLAUSE ) of the Gas Purchase Agreement for the period June 21, 1974, to September 24, 1975. Judgment in the amount of $39,444.80, with costs and interest, was demanded. Western Slope answered with a general denial, an assertion that Superior's interpretation of the contract would render it "void and unlawful as against public policy," and the further assertion that Superior had "waived the provisions of the agreement of which it now complains." On April 21, 1977, by leave of the court, Superior's complaint was amended to declare the period of the alleged breach to be "from June 21, 1974, to the present time," and to change the amount of the judgment demanded to $431,315.16 plus any additional sums that may become due during the pendency of the action, together with costs and interest. On April 29, 1977, Western Slope moved for summary judgment. On May 6, 1977, the Public Utilities Commission ("PUC") of the State of Colorado moved to intervene as a party defendant or to file an amicus curiae brief. The motion to intervene was denied, but permission to file an amicus curiae brief was granted. As noted by the district court, and contrary to Western Slope's assertion in its answer to Superior's complaint, PUC's amicus brief urged that favored nations clauses not be declared contrary to public policy.[6] On May 12, 1977, Western Slope filed a general denial to the amended complaint and incorporated by reference its original answer. On May 17, 1977, counsel stipulated that the separate actions by Superior and Conoco against Western Slope may be consolidated for all purposes and that Western Slope's motion for summary judgment against Superior was fully applicable to the action by Conoco against Western Slope. The district court, by order of May 23, 1977, declined to consolidate the cases for all purposes "at this time," but directed that the motion for summary judgment apply to both cases.
 
 
 28
 On June 17, 1977, an affidavit by Francis X. Barry, currently employed by Superior, was submitted in opposition to Western Slope's motion for summary judgment. It recites that he was Supervisor of Natural Gas and Product Sales in 1964 and that his duties included the negotiation of gas sales contracts; that, based on his knowledge and experience in the industry, in 1964 the concept of vintaging, as developed by the FPC, "played no part in intrastate gas sales contracts"; that the phrase "other conditions of sale" used by Superior in intrastate gas sales contracts "refers solely to the physical characteristics of the gas sale (Sic ), such as quality, temperature, pressure and delivery point"; and that the phrase "other conditions of sale" used in Article 8.4 of the gas purchase agreement between Superior and Western Slope "refers solely to the comparability of the sale (Sic ) based on physical characteristics."
 
 
 29
 On July 8, 1977, an affidavit by Robert F. Jonas, Vice President and General Manager of a wholly-owned subsidiary of Public Service Company of Colorado, was submitted in support of Western Slope's motion for summary judgment. It recites that he was employed by Western Slope in 1963 and 1964 as the Superintendent of Gas Supply and supervised preparation of numerous gas purchase contracts, including the January 3, 1964, Gas Purchase Agreement between Western Slope and Superior and Conoco; that the intent of requiring consideration of quality of gas, bases of measurement, delivery pressure, and other conditions of sale in connection with the administration of Article 8.4 "was to ensure physical and economic or price comparability with other sales of gas"; that "A principal reason for looking at physical comparability is that variations in quality, heating value, pressure, etc., are considered to affect the economic value of the gas"; that the purpose of the phrase "other conditions of sale" in Article 8.4 "was to cover other factors that were not otherwise enumerated that might affect future comparability of the economic value of the natural gas"; and that, based on his thirty years' experience, he was "unaware of any physical characteristics related to gas sales other than quality, bases of measurement, and delivery pressure that are not already defined in the gas purchase agreement."[7]
 
 
 30
 District Court Order Granting Summary Judgment for Western Slope
 
 
 31
 The district court, concluding that the favored nations clause does not trigger the payment of higher rates for all gas without regard to its vintage, granted Western Slope's motion for summary judgment on July 29, 1977.
 
 
 32
 The court noted that the purpose of including a favored nations clause in a gas purchase agreement "was to protect the seller over the period of the long-term contract by ensuring price comparability with other gas sold in the designated area or field."[8] It found that, in 1964, "the concept of vintaging was not a 'condition of sale' contemplated by the parties for purposes of establishing Comparability of gas under the favored nations clause" and the "significance of vintaging was both unforeseen and unforeseeable"; that the "significance of vintaging for Interstate gas contracts could not have been recognized until 1971, when the FPC initially developed this concept."[9] (Emphasis supplied.) Nevertheless, it said:
 
 
 33
 We hold that the phrase "other conditions of sale" in Article 8.4 of the contract includes vintage and other factors that influence the Value of gas sold to Defendant by other buyers (Sic, "sellers") in the area specified therein. (Footnote omitted; emphasis supplied.)
 
 
 34
 In support of this holding, the court reasoned:
 
 
 35
 If a long-term contract is to be maintained, its provisions must be interpreted, if possible, in a manner that permits the continuing viability of such contracts in a world of changing externalities. . . .
 
 
 36
 Plaintiff's interpretation of Article 8.4 ignores the vintage of gas for purposes of determining its comparability with gas produced by other companies in the area. Only four of Plaintiff's wells were commenced on or after January 1, 1973. ([10] However, Plaintiff insists on being paid new vintage gas prices for all gas delivered to Defendant. Plaintiff would thereby be treated more favorably than other producers which sell gas to Defendant, a result that is not called for by any form of price equalization clause. If particular relevant factors of comparability were not considered, such clauses would quickly be recognized as unjust, would not be included in contracts, and long-term gas contracts would no longer be made. The public might suffer from the absence of long-term commitments of adequate gas. . . . Vintage has become a significant factor in determining the value of gas, and must be considered in comparing gas for purposes of triggering a price equalization or escalation clause.
 
 
 37
 Defendant's construction of Article 8.4, which permits consideration of vintage in determining the comparability of gas, is the only reasonable interpretation of the contract. . . .
 
 
 38
 As we have seen, the FPC developed the concept of vintaging in order to account for increased cost of production from newly-drilled wells. ([11] The favored nations clause was inserted in the contract in order to ensure that Plaintiff would be paid a fair value for its gas over the 20-year period of the contract. The value of gas is directly related to the cost of its production. Therefore, vintage is an essential factor in determining comparability of gas for purposes of the favored nations clause.
 
 
 39
 Referring to Pure Oil Co. v. F.P.C., 299 F.2d 370 (7th Cir. 1962), as the "leading case on the issue of what factors should be considered by the Court in interpreting a favored nations clause," the district court quoted from the opinion in that case, Id. at 373, thus:
 
 
 40
 And, inasmuch as it is the actual comparative values which must determine the true relationship of prices as being higher, equal or lower, we perceive no error in the legal conclusion, inherent in the Commission's determination, that the comparability clauses require consideration and comparison of all factors, whether or not the express subject of contract provision, which are pertinent to arriving at the value of the gas as delivered. Such factors, while not embracing purely subjective elements which may represent value to the particular purchaser only, do include those attributes and characteristics which serve to measure the value for pipe line distribution purposes of the gas contracted to be delivered.
 
 
 41
 Finally, the court said that FPC's rejection of contracts containing favored nations clauses does not extend to intrastate contracts and that it expressed "no view as to whether favored nations clauses are void as a matter of public policy." However, it quoted from Permian Basin Area Rate Cases, 390 U.S. 747, 782-83, 88 S.Ct. 1344, 1368, 20 L.Ed.2d 312, 344-345 (1968) as follows:
 
 
 42
 Indefinite escalation clauses "cause price increases . . . to occur without reference to the circumstances or economics of the particular operation, but solely because of what happens under another contract." 34 F.P.C., at 373. There is substantial evidence that in design and function they are "incompatible with the public interest. . . ." Order No. 232, 25 F.P.C. 379, 380. Indeed, this Court has already entirely sustained the Commission's 1962 order. FPC v. Texaco, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964). (Footnote omitted.)
 
 Opinion
 
 43
 The dispositive issue raised by this appeal is whether the phrase "other conditions of sale" in Article 8.4 of the contract between the parties includes vintage, which was established by regulations of the FPC for interstate sales of natural gas.[12] If such vintage is so included, payment by Western Slope of higher prices to sellers pursuant to an "F.P.C. price protection clause" did not trigger the favored nations clause in the parties' contract; if such vintage is not so included, such payment did trigger the favored nations clause, thereby entitling Superior to the higher prices it has claimed.
 
 
 44
 Because the parties are in dispute over the meaning of the phrase "other conditions of sale," it is necessary to determine, if possible, what the intent of the parties was at the time they entered into the contract. 4 Williston on Contracts, § 600 at 284-85 (3d ed. 1961). As this court stated in Tenneco Oil Co. v. Gaffney, 369 F.2d 306, 308 (10th Cir. 1966):
 
 
 45
 It is the court's duty to construe the instrument "so as to effectuate the manifest intention of the parties to give life and vitality to the language the parties have used to express their agreement." Ryder Truck Rental, Inc. v. Central Packing Co., 10th Cir., 341 F.2d 321, 323-24, cert. denied 382 U.S. 827, 86 S.Ct. 60, 15 L.Ed.2d 71. "It is well established * * * * that in interpreting a written contract, the court should, as far as possible, place itself in the position of the parties at the time of its execution, and then, from a consideration of the instrument itself, its purposes, and the circumstances surrounding its execution, ascertain the intention of the parties. * * * " United States v. Essley, 10th Cir., 284 F.2d 518, 520.
 
 
 46
 If the intent of the parties cannot be determined from the contract itself, then other evidence must be considered.
 
 
 47
 With respect to the contract itself, if there is any point on which there is "manifest intention" of the parties, it is, that they Not come under FPC control at least insofar as gas purchased under the contract is concerned. This is clearly shown by Article 7.1 ("INTRASTATE UTILIZATION "). Western Slope's position (that FPC's vintaging regulations, although "unforeseen and unforeseeable" and "not a 'condition of sale' contemplated by the parties" in 1964, come within the scope of the phrase "other conditions of sale" and, therefore, control the price of gas purchased by Western Slope from Superior) is clearly contrary to such manifest intention of the parties. It is true that such control by FPC would not be direct, as in the case of an "F.P.C. price protection clause," where the seller has voluntarily submitted to the bitter of FPC vintaging regulations in exchange for the sweet of an increased price. But direct or indirect, the Substance of such an interpretation of "other conditions of sale" would simply be to rewrite the favored nations clause (quoted earlier) by adding at the end thereof the following:
 
 
 48
 Provided, that if said higher price is paid pursuant to an "F.P.C. price protection clause" in the contract between Buyer (Western Slope) and said producer, and said higher price is contingent upon said producer's compliance with vintaging regulations of the FPC, said higher price shall be paid Seller (Superior) only if it is in compliance with said vintaging regulations of the FPC.
 
 
 49
 As this court said in Quad Construction, Inc. v. Wm. A. Smith Contracting Co., 534 F.2d 1391, 1394 (1976): "The courts interpret contracts as made by the parties and do not make new ones for them. Yamin v. Levine, 120 Colo. 35, 206 P.2d 596, 597 (1949)."
 
 
 50
 Our conclusion with respect to the manifest intention of the parties is reenforced by evidence of Western Slope's own interpretation (prior to the dispute) of the phrase "other conditions of sale" as not including vintaging. We have earlier pointed to Western Slope's letter, dated May 30, 1974, advising Superior that on May 15 it had commenced paying to another producer a higher price (35cents per MCF) to which Superior was entitled; this notwithstanding that the higher price to the other producer was for gas from wells drilled on or after January 1, 1973.[13] Although Superior asserts that such action estops Western Slope from maintaining that Superior is not entitled to the higher prices paid other producers within the favored nations area, without reaching that issue, we regard such action as evidentiary of the understanding and intent of the parties that the phrase "other conditions of sale" not encompass vintage established by FPC regulations.
 
 
 51
 Western Slope argues that "other conditions of sale" in the favored nations clause should be interpreted as though reading "other conditions of the other sale" (I. e. the sale from another producer to Western Slope which would trigger the clause). Assuming Arguendo that such an interpretation were correct, it would mean that the "other conditions of sale" (to Western Slope from another producer) must be compared to the "other conditions of sale" to Western Slope from Superior for the purpose of determining price comparability. Significantly, in its letters to Superior dated October 24, 1972, and May 30, 1974 (and in its letter to Conoco dated January 15, 1975), Western Slope, in giving assurance that it would pay a higher price as long as it pays an "equivalent price" to another, appears to equate "conditions of delivery of the gas" with "conditions of sale." Clearly, "conditions of delivery of the gas" would not include date of drilling of the wells. Rather, as noted earlier (note 7, Supra ), such conditions would include (a) delivery pressure (specifically listed in the favored nations clause but not in the referenced letters from Western Slope), (b) delivery location, (c) installation, maintenance, and operation of equipment, (d) size, type, location, and method of setting of meters, (e) ownership, control, and possession of the gas, and (f) delivery taxes.
 
 
 52
 Superior and Amicus argue that, under the rule of ejusdem generis,[14] the phrase "other conditions of sale" relates to physical characteristics of the gas not specifically listed, such as compression, deliverability, and treatment of the gas. Western Slope responds that "the enumeration which precedes the language ("other conditions of sale") includes All the relevant physical characteristics of gas," so that, to give effect to the language, "other conditions of sale" cannot be restricted to physical characteristics. Broadly construed, the words "quality of the gas, bases of measurement, (and) delivery pressure" that precede the phrase "other conditions of sale" would appear to include all physical characteristics, including compression, deliverability, and treatment of the gas, so that "other conditions of sale" would have to encompass something more if the phrase is to be meaningful. But this is not reconcilable with the district court's finding that a favored nations clause "ensures that the seller receives the highest price paid by the buyer . . . to any other seller in a specified area for a Substantially similar product." (Emphasis supplied.) Moreover, it does not compel the conclusion that contrary to the manifest intention of the parties, the phrase must encompass vintaging established by regulations of the FPC and not even contemplated by the parties. Rather, it would seem more likely that the parties intended the phrase to encompass "conditions of delivery of the gas." Narrowly construed, the words that precede the phrase "other conditions of sale" would not necessarily include such physical characteristics as treatment of the gas, compression, and peaking capability, so that the phrase "other conditions of sale" could reasonably be interpreted to relate only to physical characteristics of the gas.
 
 
 53
 Finally, Western Slope (as did the district court) relies heavily on Pure Oil v. F.P.C., 299 F.2d 370 (7th Cir. 1962), for support of its position that "all factors, such as vintage, relevant to determine price comparability, whether mentioned in the contract or not, should be considered." We observe, however, that the favored nations clauses in that case were not the same as the one before us, two of them providing:
 
 
 54
 * * * In determining whether the price payable under such other contract or agreement is "higher" than the price payable for gas under this agreement, due consideration shall be given to the provisions of this agreement as compared with such other contract or agreement as to quantity and quality of gas, delivery pressures, gathering and compressing arrangements, provisions regarding measurement of gas including deviation from Boyle's Law, taxes payable on or with respect to such gas, and all other pertinent factors.
 
 
 55
 The case involved interstate gas. It was not concerned with vintaging (a concept unforeseen at the time) or with an intrastate utilization provision. The issue was whether the phrase "all other pertinent factors" included exceptional peaking capacity to which the higher price paid under another contract was attributable. The court held that the factor of peaking capacity was included, so that a price increase under the favored nations clause was not triggered. It said, Inter alia, 299 F.2d at 373:
 
 
 56
 Pure contends the determination of "higher price" is limited to a comparison of these specified elements and such other pertinent factors as appear from the face of the contracts, and that the "all other pertinent factors" provision of the clauses does not extend to a factor such as peaking quality or capacity, a quality not an express subject of some provision or term of the contracts.
 
 
 57
 We agree with Pure that resolution of this issue of contract construction does not involve a matter which falls within the purview of Commission expertise but we are not persuaded by any of the arguments advanced by Pure that the record evinces an intention of the parties to limit the ordinary import and breadth of scope of the language "all other pertinent factors" in the manner contended for by Pure. . . . Such factors, while not embracing purely subjective elements which may represent value to the particular purchaser only, do include Those attributes and characteristics which serve to measure the value for pipe line distribution purposes of the gas contracted to be delivered. (Emphasis supplied.)
 
 
 58
 We agree with the decision in the Pure Oil case. Peaking capacity would reasonably be considered among the "attributes" or "characteristics" to be taken into account in measuring the value of gas for pipeline distribution. See Shell Oil Co. v. F.P.C., 334 F.2d 1002 (3d Cir. 1964). At the same time, we are not persuaded that well-drilling dates (vintage) constitute such "attributes" or "characteristics," since there is no difference between "old" and "new" gas for distribution or consumption purposes.
 
 
 59
 Although we would agree with the district court that vintage has become a significant factor in the Pricing of Interstate gas, we do not indulge the district court's speculation that failure to consider vintage in comparing gas for purposes of triggering a favored nations clause in intrastate gas purchase agreements would mean an end to long-term gas contracts and that this might be harmful to the public.[15] Moreover, as earlier related (note 6, Supra ), the Colorado PUC urged the district court to not declare favored nations clauses void as contrary to public policy, and the court said it expressed no view on that matter.[16]
 
 
 60
 In view of the foregoing, we hold that, on the facts of this case, the phrase "other conditions of sale" in Article 8.4 of the contract between the parties does not include vintaging established by regulations of the FPC for interstate sales of natural gas.
 
 
 61
 The orders of the district court are vacated, and the cases are remanded for further proceedings consistent with this opinion.
 
 BARRETT, Circuit Judge, concurring:
 
 62
 I concur in the analysis and interpretations of the subject contracts. In view of the fact that the cause is being remanded for further proceedings, including a determination of whether the "favored nations" clause is void as contrary to public policy, I am compelled to express my views on the public policy considerations.
 
 
 63
 The core of the controversy in this case centers around the question of whether the phrase "other conditions of sale" in Article 8.4 of the contract herein includes the concept of "vintage pricing" as adopted by the Federal Power Commission, now the Federal Energy Regulatory Commission. In undertaking the assessment of this question, I believe, we must analyze: (i) the policies underlying the concept of "vintage pricing" as adopted by the Federal Power Commission; (ii) the purposes served by inclusion of "favored nations" clauses in gas purchase and sale agreements; and (iii) the public policy considerations affecting the inclusion and enforcement of such clauses, both in the interstate and intrastate market.
 
 
 64
 POLICIES UNDERLYING THE CONCEPT OF "VINTAGE PRICING" IN THE
 
 INTERSTATE NATURAL GAS MARKET
 
 65
 In 1924 the Supreme Court sowed the seeds for federal regulation of interstate sales of natural gas when it reviewed Missouri v. Kansas Natural Gas Co., 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027 (1924). The court was there called on to determine whether a producer state could constitutionally regulate the price of natural gas sold to distributing companies for resale and consumption in other states. The court held that such regulation would unconstitutionally burden or impede the flow of interstate commerce, notwithstanding the absence of federal occupation in the field. In reaching this conclusion, the court observed:
 
 
 66
 The contention that, in the public interest, the business is one requiring regulation, need not be challenged. But Congress thus far has not seen fit to regulate it, and its silence, where it has sole power to speak, is equivalent to a declaration that the particular commerce shall be free from regulation. (Citation). 265 U.S. at page 308, 44 S.Ct. at pages 545-546.
 
 
 67
 This decision prompted Congress, through the Federal Trade Commission, to conduct detailed investigations into the structure of the natural gas industry. See: S.Res. 83, 70th Cong., 1st Sess., 69 Cong.Rec. 3054 (1928); S.Doc. No. 12, 70th Cong., 1st Sess. (1928-1936). Ultimately these investigations culminated in the passage of the Natural Gas Act, 15 U.S.C. Sec. 717 Et seq. See: Davis, The Influence of the Federal Trade Commission's Investigations on Federal Regulation of Interstate Electric and Gas Utilities, 14 Geo.Wash.L.Rev. 21 (1945); DeVane, Highlights of Legislative History of the Federal Power Act of 1935 and the Natural Gas Act of 1938, 14 Geo.Wash.L.Rev. 30 (1945).
 
 
 68
 Under the Natural Gas Act, the Federal Power Commission, now the Federal Energy Regulatory Commission, became primarily responsible for establishing the rate at which natural gas could be sold in interstate commerce. In formulating its regulatory scheme, the FPC was initially faced with a choice between two alternatives. First, it could employ common carrier regulation and set nationwide rate scheduling. Second, it could adopt a public utility approach based on individualized treatment of entities within its jurisdiction. See: Note, Natural Gas Rate Regulation: The Conflict in the Application of the Just and Reasonable Standard, 12 Tulsa L.J. 293 (1976). Adopting the public utility regulatory concept, the Commission employed a "prudent investment" approach and based pricing on "actual legitimate costs". The Commission's approach was sustained by the Supreme Court in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), wherein the court held that "(t)he fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests." F.P.C. v. Hope Natural Gas Co., supra at 603, 64 S.Ct. at 288. Thus the "prudent investment" approach, which defined a new minimum return to which natural gas producers were entitled, turned on a delicate balancing of the natural tension found between the industry's goal of maximizing profits and the consumer's interest in paying the lowest possible price for natural gas.
 
 
 69
 In an effort to work within the constraints of this "prudent investment" approach, the FPC conducted detailed investigations into the financial condition of entities within its jurisdiction in order to arrive at "just and reasonable" rates. This individualized treatment, however, had to be abandoned when the Commission faced a tremendous increase in workload following the Supreme Court's expansion of its jurisdiction in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). The "move" from this individualized treatment approach began in Phillips Petroleum Co., 24 FPC 537 (1960), Aff'd. Wisconsin v. Federal Power Commission, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); wherein the Commission stated that the:
 
 
 70
 (e)xperience of the Commission . . . has shown, beyond any doubt, that the traditional original cost, prudent investment rate base method of regulating utilities is not a sensible, or even a workable method of fixing the rates of independent producers of natural gas . . . (T)he better method (of regulating the price of natural gas) would be to establish fair prices for the gas itself and not for each individual producer. . . . We are, simultaneously with the issuance of this opinion and order, promulgating a policy statement setting forth rate guidance levels for various producing areas of the country. We are thereby establishing Two prices for each of these areas; (1) a price applicable to New contracts, above which we will not certificate new sales without justification of the price and; (2) a price pertaining to Existing contracts, above which we shall suspend price escalations. (Emphasis supplied.) 24 F.P.C. 537 at pages 542, 547.
 
 
 71
 In the accompanying statement of general policy, the Commission observed:
 
 
 72
 Two price standards are set for each area. Initial prices in new contracts are, and in many cases by virtue of economic factors, must be higher than the prices contained in old contracts. For this reason, we have found it advisable to adopt Two schedules of prices, one pertaining to initial prices in New contracts, and one pertaining to escalated prices in Existing contracts. It is anticipated that these differences in price levels will be reduced and eventually eliminated as subsequent experience brings about revisions in the prices in various areas. (Emphasis supplied.) Statement of General Policy No. 61-1, 24 F.P.C. 818, 819 (1960).
 
 
 73
 Thus, although anticipated to be only a stop-gap measure, the concept of "vintage pricing" by contract date developed as early as 1960, some three years prior to the execution of the contract in this case.
 
 
 74
 Following the announcement of this "statement of general policy", the Commission began proceedings under Section 5(a) of the Natural Gas Act, 15 U.S.C. Sec. 717d(a) to determine rates in the Permian Basin rate area. Hearings began on October 11, 1961, and closed on September 10, 1963. The Commission issued its decision on August 5, 1965. In its decision, the Commission embraced the concept of "vintage pricing" providing "one area maximum price for natural gas produced from gas wells and dedicated to interstate commerce after January 1, 1961. It created a second, and lower area maximum price for all other natural gas produced in the Permian Basin." Permian Basin Area Rate cases, 390 U.S. 747, 759, 760, 88 S.Ct. 1344, 1356, 20 L.Ed.2d 312 (1968). (Footnote omitted.)
 
 
 75
 The Commission's decision was affirmed by the Supreme Court in Permian Basin Area Rate cases, supra.
 
 
 76
 This area rate two tier approach dominated until 1972 when the FPC "went on to virtually abandon the concepts of area pricing and contract vintaging," (Shell Oil Company v. Federal Power Commission, 491 F.2d 82, 84 (5th Cir. 1974)), in Opinion 639, 48 F.P.C. 1299 (1972) Aff'd. Shell Oil Co. v. Federal Power Commission, supra. With particular regard to "vintaging", the Commission stated:
 
 
 77
 We believe vintaging to be an anachronism which we should now move to eliminate. Vintaging operates to discourage development of the full productive capacity of acreage committed to the interstate market, for even though such developmental drilling is undertaken at current costs, gas production obtained thereby is priced at the Lower of two rates, when it is the Higher of the two that is Commission-designed to provide the incentive for development of additional gas supplies. 48 FPC at page 1309.
 
 
 78
 This move to eliminate "vintaging" continued in Opinion 699, --- FPC ---, Reprinted (1974) 1 Fed. Power Serv. at 5-307, wherein the Commission abandoned area rate making for a uniform national base rate and allowed "old" gas to be sold at the price of "new" gas upon a "rollover" of the contract. The Commission's action was sustained in Shell Oil Co. v. Federal Power Commission, 520 F.2d 1061 (5th Cir. 1975), Cert. denied, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976). Later, however, in Opinion 770, --- F.P.C. ----, Reprinted at 41 Fed.Reg. 33364 (1976), the Commission repudiated its position of eliminating contract vintaging, stating:
 
 
 79
 We are aware of the problems occasioned by the continuance of the vintaging concept. The Commission, however has a responsibility to minimize severe and harmful economic dislocation due to increased rates. * * * Our decision to modify the policy set forth in Opinion 699-H, with respect to the effective date on which gas initially qualifies for a new rate, is based on a determination that the increased costs of exploration and production and the decreased productivity of wells should only be reflected in the rates for the corresponding period, and not for a prior period. 41 Fed.Reg. at p. 33666. (Emphasis supplied.) (Footnotes omitted.)
 
 
 80
 Opinion 770 was recently upheld in America Public Gas Ass'n. v. Federal Power Commission, 186 U.S.App.D.C. 23, 567 F.2d 1016 (1977), Cert. denied 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).
 
 
 81
 Thus, the synthesis of these opinions indicates that, although "vintage pricing" has endured some turbulent times in the past, it nevertheless remains viable primarily because it is based on "a determination that the increased costs of exploration and production and the decreased productivity of wells should only be reflected in the rates for the corresponding period and not for a prior period." Opinion 770, Supra. "Vintage pricing" thereby serves the producer by allowing a "just and reasonable" return on his profit while at the same time preventing "windfall profits" thereby protecting the consumer.
 
 
 82
 MOST FAVORED NATIONS CLAUSES AND PUBLIC POLICY
 
 
 83
 Normally, gas purchase and sale contracts contain pricing provisions which provide for an increase in the price of gas purchased and sold under specified circumstances. See 4 Williams, Oil and Gas Law, Section 726. (1972). These escalation clauses, commonly referred to as "favored nations" clauses, are broadly classified into two categories: Two-party clauses and third-party clauses.
 
 
 84
 Two-party favored nations clauses provide: "that the price to be paid (a) Seller by (a) Buyer will be increased to match any higher price contracted to be paid by the same Buyer to any other seller in the same field or area." 4 Williams, Supra, at Sec. 726. Third-party clauses, on the other hand require "the Buyer to meet any higher price contracted to be paid by any other buyer in the same field or area." 4 Williams, Supra, at Sec. 726. Inasmuch as the provisions of Section 8.4 of the contract herein question can only be triggered by Western Slope, we are dealing with a two-party favored nations clause.
 
 
 85
 Professor Williams, in his treatise, states that the inclusion of such clauses in gas purchase and sales contracts has primarily resulted from governmental regulations specifically the FPC's requirement that gas producers dedicate their supplies to the interstate market for long periods of time. 4 Williams, Supra, at Section 726. Such clauses, he argues, are necessary to protect a seller from potential losses due to increases in the market price of his product during the term of the contract. Texas Gas Transmission Corporation v. Shell Oil Company, 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1970).
 
 
 86
 Such clauses naturally grant an advantage to the seller. As such, they have generally been construed in favor of the buyer and against the seller. Neither the courts, nor regulatory agencies dealing with such clauses, have looked upon them with favor. The Federal Power Commission has specifically declared that such two-party favored nations clauses are contrary to the public interest:
 
 
 87
 Considering all the circumstances, we are of the opinion that the two-party favored nation clauses in Pure's contracts with El Paso, and indefinite escalation clauses generally (3) are contrary to public interest. From the beginning of Commission regulation of independent producers under the Phillips decision in 1954 (4) the undesirable and injurious aspects of such escalation provisions generally have been forcibly impressed on us and proceedings were early instituted looking to the elimination of such provisions. (5) And although the record in this case was made with special reference to Pure's two-party provisions, by reasonable implication it confirms our conclusion based upon our experience with other types of indefinite escalation provisions, that such provisions generally are contrary to the public interest.
 
 
 88
 The record establishes that Pure's favored nation clauses are contrary to the public interest in a number of ways. First, they are, in the context of Commission regulation of producers under the Act, by their nature and in their effects inherently unreasonable. As indicated previously, under Pure's provisions, the company's prices are subject to triggering if El Paso pays any other producer within the specified area a higher price. There need be no economic or other substantial justification for the increase; the mere fact that a higher price is paid to some other producer would be sufficient to activate the increase. In our view, such an artificial ground for a proposed increase, operating in such a mechanical and arbitrary manner, and lacking any substantial relationship to the factors which bear on the value of gas or on a determination of a reasonable level of rates for it, does not constitute a proper basis for filing proposed increased rates or a sufficient justification for our giving effect to such a filing, at least if the rate contained therein is in excess of those in our producer price Policy Statement 61-1, as amended. (6)
 
 
 89
 Assuming that indefinite escalation clauses in producer contracts had some justification years ago, when a lack of purchase outlets and lack of consumer demand forced prices to abnormally low levels, this justification no longer exists today, when purchasers of gas are numerous, consumer demand is strong, and buyers are competing eagerly for available supplies of gas. In our judgment, in the light of continuing increases in the price of gas in recent years and the present high level of prices, escalation clauses such as Pure's have by now outlived whatever economic function they may have had. Opinion No. 341, 25 F.P.C. 383, (1961) Aff'd. Pure Oil Company v. Federal Power Commission, 299 F.2d 370 (7th Cir. 1962). (Footnotes omitted.)
 
 
 90
 See also: Opinion No. 546, 40 F.P.C. 530 (1968), Aff'd. sub nom., Austral Oil v. Federal Power Commission, 428 F.2d 407 (5th Cir. 1970); On rehearing, 444 F.2d 125 (5th Cir. 1970), Cert. denied sub nom., Municipal Distributor Group v. Federal Power Commission, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970); Order No. 242, 27 F.P.C. 339 (1962), Rev'd. Texaco v. Federal Power Commission, 317 F.2d 796 (10th Cir. 1963), Rev'd. Federal Power Commission v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); Order No. 232-A, 25 F.P.C. 609 (1961).
 
 Similarly, the Supreme Court has declared:
 
 91
 Indefinite escalation clauses "cause price increases . . . to occur without reference to the circumstances or economics of the particular operation, but solely because of what happens under another contract." 34 F.P.C., at 373. There is substantial evidence (48) that in design and function they are "incompatible with the public interest . . ." Order No. 232, 25 F.P.C. 379, 380. Indeed, this Court has already entirely sustained the Commission's 1962 order. FPC v. Texaco, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112. (Footnote omitted.) Permian Basin Area Rate Cases, supra, 390 U.S. at pp. 782-783, 88 S.Ct. at 1368.
 
 
 92
 Perhaps more significantly, however, inasmuch as this is a diversity of citizenship case, is the view of the Public Utilities Commission of the State of Colorado:
 
 
 93
 . . . (T)he Commission will expect Peoples (a public utility), in all future renegotiations of existing contracts, or negotiations for new contracts, with wellhead producers vigorously to oppose inclusion of "favored nation clauses" in such contracts. In the Commission's view, such clauses have resulted in increased rates to Peoples' ratepayers without any justification in terms of cost or even market factors. From the cost point of view, it is quite clear that the cost of producing gas from an older well is not related to the price that the utility may be paying for gas from a more recent vintage well. Also, the market conditions, as between interstate and intrastate production were changed in FPC Opinion No. 770A, and subsequent errata notices thereto, in that if the wellhead producer, who previously had been serving intrastate commerce, decides to dedicate his gas to interstate commerce, he can only obtain the applicable vintage price dependent upon his well commencement date. Thus, in all future filings by Peoples, any cost increase which is attributable to a so-called "favored nations clause" included in a contract entered into after the date of this decision will be subjected to close scrutiny and may be disallowed as an expense for ratemaking purposes. Colorado PUC Decision No. 90563, Modifying and adopting Colorado PUC Decision No. 90030, Aff'd. Peoples Natural Gas v. Public Utilities Commission, 590 P.2d 960 (Colo.1979).
 
 
 94
 In summary, I find that there is a consensus among the courts and agencies, both at state and federal levels, that "favored nations" clauses are contrary to the public interest, in that they cause excessive and unreasonable price increases which operate in "a mechanical and arbitrary manner" and lack "any substantial relationship to the factors which bear on the value of gas or on a determination of a reasonable level of rates for it." FPC Opinion No. 341, Supra.
 
 
 95
 THE TRIPARTITE PROBLEM: VINTAGE PRICING, FAVORED NATIONS
 
 CLAUSES AND THE INTRASTATE CONTRACT
 
 96
 It is clear that the Federal Power Commission, now the Federal Energy Regulatory Commission, cannot exercise its jurisdiction over intrastate sales of natural gas. See: Central States Electric Co. v. City of Muscatine, 324 U.S. 138, 65 S.Ct. 565, 89 L.Ed. 801 (1945). However, this jurisdictional limitation does not prevent courts from drawing upon the experience and expertise of the FPC in interpreting intrastate contracts when the policies of the FPC do not conflict with state policy.
 
 
 97
 We have already seen that "favored nations" clauses, such as the clause found in Article 8.4 of the contract herein, are generally contrary to the public interest, in that they encourage artificial price escalations without regard to "the factors which bear on the value of gas or on a determination of a reasonable level of rates for it." Opinion No. 341, Supra. As such, these escalation clauses cause windfall profits and substantially increase the cost to consumers for a commodity without which they may well not be able to live. The impact of such escalations on the general public could well be devastating in states where consumers are highly dependent upon the use of natural gas. As such, the interpretation of "favored nations" clauses should be subjected to close scrutiny.
 
 
 98
 On the other hand, we have seen that the "vintage pricing" policies of the Federal Power Commission, were designed to allow producers only a "just and reasonable" return on their capital investment. As pointed out by both the Federal Power Commission, and the Public Utilities Commission of Colorado, the "cost of producing gas from an older well is not related to the price . . . for gas from a more recent vintage well." Colorado Public Utilities Commission Decision No. 90563, Supra. The creation of the "vintage pricing" technique resulted from a carefully drawn balance between the natural tension of the industry's goal of maximizing profits and the consumers' interest in paying only reasonable rates for natural gas.
 
 
 99
 It is clear, from the opinions of the FPC and Colorado Public Utilities Commission, that the courts may be justified in declaring the "favored nations" clause here in question void as against public policy. However, it is well settled that contracts are presumed to be legal and enforceable and that an ambiguously worded contract should not be interpreted to render it illegal and unenforceable, where the wording lends itself to a logically acceptable construction which renders it legal and enforceable. Walsh v. Schlecht, 429 U.S. 401, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977). In this case, the wording "other conditions of sale" in Article 8.4 of the contract, does lend itself to a logically acceptable construction which renders the contract as a whole legal and enforceable. That interpretation, of course, is to include the concept of "vintage pricing" in the phrase "other conditions of sale" and allow Superior only a "just and reasonable" return on its investment in those wells commenced prior to January 1, 1973.[1] These expressions are, of course, my views on the public policy matter the District Court is to consider on remand.
 
 
 
 *
 The Honorable Jack R. Miller, Judge of the United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 Phillips Petroleum Company has filed an amicus curiae brief, noting that it sells gas to Western Slope from its leases in Rio Blanco County, Colorado, under a contract that is similar in all relevant respects to the Superior-Western Slope contract, with an identical favored nations clause
 
 
 [2]
 Eighteen months before the Federal Power Commission issued its decision of August 5, 1965 (34 F.P.C. 159 and 1068) embracing the concept of "vintage pricing," discussed Infra. See Permian Basin Area Rate Cases. 390 U.S. 747, 755, 759-60, 88 S.Ct. 1344, 1353, 1355-1360, 20 L.Ed.2d 312, 329, 331-332 (1968)
 
 
 [3]
 A similar letter, dated January 15, 1975, from Western Slope to Conoco, with a copy to Superior, advised that Western Slope began paying a higher price to which Conoco was entitled under Article 8.4, namely: 45cents per MCF, effective January 12, 1975. Like the letters to Superior, this letter advised:
 Western will continue to pay this price for so long as it pays an Equivalent price to others as provided in Article 8.4. This price is subject to change in the event that the quality or Conditions of delivery of the gas we are receiving from you changes. (Emphasis supplied.)
 
 
 [4]
 The "F.P.C. price protection clause" included in an agreement dated October 23, 1973, between Western Slope and Cities Service Oil Company made no reference to vintage and simply provided:
 The price or rate established from time to time by the Federal Power Commission (or any successor agency) as the area ceiling price or rate so authorized, for the specific area within which subject gas well or wells are located, subject to the same general terms and conditions as applicable to such base price or rate.
 According to an affidavit of Western Slope's Gas Purchase Contract Administrator, James Valenta, clauses such as this were revised to specifically include a vintage provision "to make absolutely clear that vintage was to be a factor in the implementation of those clauses." This action followed FPC's Opinion No. 699, issued June 21, 1974, establishing a rate of 50cents per MCF for gas produced from wells commenced on or after January 1, 1973. However, Mr. Valenta avers that the addition of the vintage language did not represent a change since Western Slope has consistently treated vintage dates as included in the phrase "general terms and conditions."
 
 
 [5]
 As stated in Western Slope's response, Opinion 658 was issued on April 11, 1973. Although stating that it had subsequently been "consistent with all of its Sellers in regard to pricing and vintaging as specified by F.P.C.," Western, as related above, increased its price to Superior as of May 15, 1974, on the basis of its payment of a higher price to another producer for gas delivered from wells with a vintage date subsequent to January 1, 1973
 
 
 [6]
 The district court also noted that PUC's brief said that favored nations clauses have resulted in increases in rates that are unjustified by production costs or other market factors
 
 
 [7]
 We note that in addition to the physical characteristic of "delivery pressure," the January 3, 1964, agreement contains provisions relating to delivery location (at the discharge side of seller's drip or separator located a minimum of 75 feet from the wellhead, seller to furnish a suitable valve at each point of delivery for buyer's connection); equipment (buyer to install, maintain, and operate at its own expense, at or near each point of delivery, orifice meters of ample size and proper type for the accurate measurement of the gas, the location and method of setting such meters to be such as to prevent pulsations of compressors from interfering with accurate measurement); ownership, control, and possession (buyer takes title at points of delivery and is deemed to be in exclusive control and possession thereof); and future taxes (if any existing taxes production, gathering, Delivery, sales, severance paid by seller are increased, buyer shall reimburse seller to the extent of 50% Of the increase for or on account of the gas delivered under the agreement)
 
 
 [8]
 However, the initiative for including such a clause appears to have come from the buyer. As explained in H. Williams Oil and Gas Law P 726 (1977):
 The Federal Power Commission has required a pipeline seeking a certificate of public convenience and necessity to show long-term commitments of and adequate supply of gas. Therefore, the pipeline companies had to demand of producers a long term (E. g. twenty years) dedication of reserves. . . . there was an obvious reluctance to fix a firm price for gas over such a substantial period of time. This led to the inclusion in the contract of one or another type of escalation clause.
 Amicus, citing a note at 112 U.Pa.L.Rev. 909, 912 (1964), makes a similar point.
 
 
 [9]
 The court noted that the validity of the FPC's regulation incorporating vintage as a condition of pricing (interstate gas) was upheld in Shell Oil Co. v. F.P.C., 520 F.2d 1061 (5th Cir. 1975), Cert. denied sub nom. California Co. v. F.P.C., 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976)
 
 
 [10]
 The court observed that on June 21, 1974, FPC issued Opinion No. 699, which established a uniform national base rate of 50cents per MCF for all wells commenced on or after January 1, 1973, and that Western Slope had been paying Superior this rate (and subsequent increases) for gas from these four wells
 
 
 [11]
 By "increased cost of production" the court probably meant to include the increased cost of exploration and drilling of exploratory and development wells
 
 
 [12]
 If the district court was correct in so holding, Western Slope's motion for summary judgment was properly granted. We agree with the district court that there are no disputed issues of material fact. We also note that Superior did not file a cross-motion for summary judgment
 
 
 [13]
 The affidavit of Western Slope's Gas Purchase Contract Administrator (note 3, Supra ) explains this action as follows:
 Because this was a base price and because at that time date of well commencement was not a widely used pricing criterion, it was concluded that the payment of this price should trigger the favored nations provision in the Superior Agreement.
 The district court merely said:
 Between May 15, and June 5, 1974, Defendant interpreted the instant favored nations clause as triggering a price increase resulting from its payment of higher rates to another producer, which, in turn, resulted from FPC vintage regulations. On June 5, 1974, Defendant received gas under a second contract, which provided a base price of $0.35 per MCF without regard to vintage. This contract obligated Defendant to pay Plaintiff $0.35 per MCF for all gas delivered under the 1964 contract between the parties.
 
 
 [14]
 Jewel Tea Co. v. Watkins, 26 Colo.App. 494, 145 P. 719 (1915); See Denver Joint Stock Land Bank v. Markham, 106 Colo. 509, 107 P.2d 313 (1940)
 
 
 [15]
 Nor do we agree with the district court that the value of gas is directly related to the cost of its production. Supply and demand are the conventional determinants. We agree with Amicus that:
 In the real marketplace the cost of production of a product often bears little or no direct relationship to the true value of the product. The actual value of a product is determined by what people will pay for it, not by what it costs to produce.
 
 
 [16]
 We note that enactment of the Natural Gas Policy Act of 1978 (Pub.L. No. 95-621), although extending federal regulation to include intrastate gas, provides for a free market between producers and purchasers in the long run
 
 
 [1]
 In the only other case brought to this Court's attention involving the "favored nations" clause versus "vintage pricing" concept, Continental Oil Company v. Southern Union Gas Co., No. 48543 (Santa Fe, N.M. Dist., filed Oct. 10, 1975), the court held, as I would, that the "favored nations" clause was void as against public policy, if it were construed to exclude "vintage pricing"