KERR–McGEE CORPORATION, a Delaware corporation, Plaintiff-Appellant,

v.

NORTHERN UTILITIES, INC., a Wyoming corporation, Defendant-Appellee.

NORTHERN UTILITIES, INC., Plaintiff-Appellee,

v.

AMOCO PRODUCTION COMPANY, a Delaware corporation, and Phillips Petroleum Company, a Delaware corporation, Defendants-Appellants.

Nos. 80–2273 to 80–2275.

United States Court of Appeals, Tenth Circuit.

March 23, 1982.

Peter J. Nickles of Covington & Burling, Washington, D.C. (Stephen H. Galebach of Covington & Burling, Washington, D.C., and William T. Schwartz of Schwartz, Bon, McCrary & Walker, Casper, Wyo., with him on the brief), for Kerr-McGee Corp.

John S. Pfeiffer of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo. (Ann E. DeVine of Gorsuch, Kirgis, Campbell, Walker & Grover, and Robert H. Landt, Denver, Colo., with him on the brief), for Amoco Production Co.

Houston G. Williams of Williams, Porter, Day & Neville, P.C., Casper, Wyo. (Thomas M. Blume and Frank A. Ackerman, Englewood, Colo., with him on the brief), for Phillips Petroleum Co.

Wm. Bryce Arendt, of Northern Utilities, Inc., and Wm. H. Brown of Brown, Drew, Apostolos, Massey & Sullivan, Casper, Wyo. (Claude W. Martin of Brown, Drew, Apostolos, Massey & Sullivan, Casper, Wyo., with them on the brief), for Northern Utilities, Inc.

B. J. Zimmerman and Patrick F. Timmons, Houston, Tex., Joseph C. Johnson and Thomas Burton, Houston, Tex., and Robert C. Hawley and Gretchen A. VanderWerf of Dechert, Price & Rhoads, Denver, Colo., on the brief, for amici curiae for Conoco, Inc. and The Superior Oil Co.

David Crump, Professor of Law, University of Houston, Susan E. Waite of Legal Foundation of America, Keith Blinn, Professor of Law, University of Houston, Houston, Tex., on the brief for amicus curiae for Legal Foundation of America.

Steven F. Freudenthal, Atty. Gen. of Wyo., Cheyenne, Wyo., on the brief for amicus curiae for the State of Wyoming.

Before SETH, HOLLOWAY and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

In this diversity action applying Wyoming law, Kerr-McGee Corporation, Amoco Production Company, and Phillips Petroleum Company (hereinafter collectively referred to as "producers") appeal a trial court decision striking down an indefinite price escalation clause in a contract for the sale of intrastate natural gas. The district court found the clause to be against public policy and unconscionable.[1] We reverse.

In 1957, the predecessor of Amoco contracted to sell appellee Northern Utilities, Inc. intrastate natural gas from the Beaver Creek field in Wyoming. Amoco, Kerr-McGee, and Phillips owned working interests in the field and Amoco acted as unit operator. Northern is an intrastate public utility regulated by the Public Service Commission of Wyoming. Northern obtains approximately 85% of its total supply of gas from the Beaver Creek field and sells about 40% of the Beaver Creek gas to Amoco and its affiliates at facilities in Wyoming.

The original contract term between Northern and producers was for twenty years, beginning in 1958. It provided for price increases under a two-party favored nations clause that pegged the price of gas to the price Northern paid any other seller.[2] The contract also granted Northern a preferential right to negotiate "for a suitable contract and price" for excess gas which might become available from Beaver Creek. App., vol. II, at 157. Northern executed contracts with Kerr-McGee and Phillips in 1958, which were identical in all relevant respects to its contract with Amoco.[3]

In 1970, Amoco notified Northern that excess gas from Beaver Creek was available for sale and invited Northern to negotiate for the purchase of the gas pursuant to its contract rights. The record indicates that Amoco, on behalf of the producers, wanted to sell the gas before the original contract was due to expire at the end of 1977. On the other hand, Northern wanted to delay production of the gas until 1978 and extend the term of the original contract.

---

1. The opinion below is published at 500 F.Supp. 624 (D.Wyo.1980).

2. The favored nations clause provided that:
   "If, at any time during the term of this agreement, Northern pays a producer of gas in the State of Wyoming a price per one thousand (1,000) cubic feet that is higher than the price being paid or otherwise payable under this contract, due consideration being given to the quality of the gas, bases of measurement and conditions of sale, Northern shall, commencing on the date of delivery of such gas at such higher price, and continuing so long as such price is in excess of the price otherwise payable under this contract,

increase the price being paid or otherwise payable to Pan American hereunder to equal such higher price. It is the intention hereof that the price to be paid Pan American hereunder shall at all times be equal to the higher of the following: (a) the price payable under Article 5 of this contract, as such price may have been changed by Article 7, or (b) the highest price paid by Northern to a producer of gas in the State of Wyoming."
   App., vol. II, at 149–50.

3. The original contract was amended four times prior to 1970. These amendments are irrelevant to the instant appeal.

After several months of negotiation, Amoco and Northern entered into a supplemental agreement which extended the contract through the end of 1990. The two-party favored nations clause was retained, and a new clause was added which is the subject of this litigation. The new clause, paragraph 6(b), is a third-party favored nations (or indefinite price escalator) clause. Under this provision, effective January 1, 1976, a rise in the contract price was to be triggered by the price received from the sale of *interstate* gas by *any* producer in the relevant area.[4] The supplemental contract was presented by Northern to the Wyoming Public Service Commission and approved for filing. Substantially similar contracts were executed in 1973 between Northern and Kerr-McGee, and Northern and Phillips, after Northern wrote to Kerr-McGee and Phillips urging them to execute the supplementary agreements.

In 1975, Amoco advised Northern that the price under the new contract would be set by paragraph 6(b) beginning January 1, 1976, because the price received by producers of interstate gas in the area would then exceed the rate established under other provisions in the contract. Northern requested and received approval from the Public Service Commission for a rate increase to cover the rise in the contract price. Amoco agreed to phase in the new prices until July 1, 1978, at which time the indefinite price escalator clause would become fully operative. Kerr-McGee did not agree to phase in the price and brought suit against Northern. Northern then sued Amoco and Phillips, and the actions were consolidated below.

After a bench trial, the judge held paragraph 6(b) void. He found that the operation of the clause would result in "exorbitant prices" beyond Northern's contemplation at the time the contract was executed. He emphasized that the issue involved a substantial public interest, and concluded that enforcement of paragraph 6(b) was contrary to public policy and unconscionable. He ordered that the remainder of the contract be enforced without the operation of paragraph 6(b).

On appeal the producers contend that the clause is not contrary to federal policy as it is articulated in the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 *et seq.* (NGPA), or to Wyoming public policy. They also argue that the court's decision flies in the face of controlling Wyoming court pronouncements on both public policy and unconscionability. We agree and hold as a matter of law that paragraph 6(b) is not violative of public policy nor unconscionable under the facts of this case.

I.

PUBLIC POLICY

A. *Federal Public Policy*

Prior to the enactment of the NGPA, contracts for the sale of intrastate gas were free from regulation. Thus, it was public policy to allow the competitive forces of the market place to set the price. The NGPA, however, imposed price controls on the intrastate gas market. *See* 15 U.S.C. § 3315.[5]

4. The added paragraph provided that:
"(b) From and after January 1, 1976, when the price to be paid by Northern to Pan American pursuant to the other provisions hereof is less than the sum of the price received for gas being sold in interstate commerce, by any producer within the State of Wyoming, except in the counties of Uinta and Lincoln, plus three cents per one thousand cubic feet (3¢/Mcf), then Northern shall increase the price to be paid Pan American hereunder to a price equal to the price being received by such producer plus three cents per Mcf."
App., vol. II, at 214.

5. This section provides in pertinent part:
"§ 3315. Ceiling price for sales under existing intrastate contracts.
(a) Application.—The maximum lawful price computed under subsection (b) of this section shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on November 8, 1978.
(b) Maximum lawful price.—
(1) General rule.—Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of—

The Act specifically permits the price under intrastate gas contracts to rise through the operation of indefinite price escalator clauses up to a maximum rate established by the Act. *See id.*; 18 C.F.R. § 270.205(b)(1) (1980);[6] *Pennzoil Co. v. FERC*, 645 F.2d 360, 368 (5th Cir. 1981).

▪ The ceiling prices set by the NGPA clearly comport with the public interest as determined by Congress. *Pennzoil*, 645 F.2d at 379 n.37. The fact that prices under intrastate gas contracts containing indefinite price escalator clauses are high and will continue to rise does not mean that these contracts are against federal public policy. One of the primary purposes of the

NGPA is to promote energy conservation. Congress believed that allowing producers to recover high prices for their gas helps implement this goal. "High energy prices provide one motivation to conserve energy. Because of these prices, an enormous range of energy conserving improvements are cost effective." S.Rep.No.409, 95th Cong., 2d Sess. 36, *reprinted in* 1978 U.S. Code Cong. & Ad. News 8800, 8806.

▪ The only reason appearing in the district court's opinion to support its conclusion that the clause offends public policy is its finding of "exorbitant" cost to the consumer.[7] However, when Congress designed

(A) the price under the terms of the existing contract, to which such natural gas was subject on November 9, 1978, as such contract was in effect on such date; or
(B) the maximum lawful price, per million Btu's, computed for such month under section 3312 of this title (relating to new natural gas).
(2) Contract price exceeding new gas ceiling price on November 9, 1978.—In the case of any natural gas described in subsection (a) of this section for which the contract price applicable on November 9, 1978, exceeds the maximum lawful price, per million Btu's, computed for such date under section 3312 of this title (relating to new natural gas), the maximum lawful price under this section shall be the higher of—
(A) the maximum lawful price, per million Btu's, computed for such month under section 3312 of this title; or
(B) (i) the contact[1] price on November 9, 1978, in the case of November 1978; and
(ii) in the case of any month thereafter, the maximum lawful price, per million Btu's, prescribed under this subparagraph for the preceding month multiplied by the monthly equivalent of the annual inflation adjustment factor applicable for such month.
(3) Price increases resulting from indefinite price escalator clauses.—
(A) In general.—Effective January 1985, and each month thereafter, in the case of any first sale of natural gas, which is sold at a price established under any indefinite price escalator clause of any existing contract or successor to an existing contract and for which the contract price on December 31, 1984, is higher than $1.00 per million Btu's, the maximum lawful price under this section for any such natural gas delivered during any month shall be the higher of—
(i) the maximum lawful price, per million Btu's, computed under paragraph (2)(B); or

(ii)(I) in the case of January 1985, the maximum lawful price, per million Btu's, computed under section 3312 of this title (relating to new natural gas) for such month; and
(II) in the case of any month thereafter, the maximum lawful price, per million Btu's, prescribed under this clause for the immediately preceding month multiplied by the monthly equivalent of the sum of a factor equal to the annual inflation adjustment factor applicable for such month plus .03.
(B) Definition of indefinite price escalator clause.—For purposes of this paragraph, the term "indefinite price escalator clause" includes any provision of any contract—
(i) which provides for the establishment or adjustment of the price for natural gas delivered under such contract by reference to other prices for natural gas, for crude oil, or for refined petroleum products; or
(ii) which allows for the establishment or adjustment of the price of natural gas delivered under such contract by negotiation between the parties.
. . . ."
"[1] So in original. Probably should be "contract"."
15 U.S.C. § 3315.

6. 18 C.F.R. § 270.205(b)(1) (1981) provides in pertinent part:
"Any contractual provision for a change in price may operate according to the terms of such provision except that such provision is not operative to authorize a seller to charge and collect an amount in excess of the highest applicable NGPA rate."

7. The judge indicated that he found the price particularly offensive because it was unrelated to the cost of production, and was higher than the producers themselves could have received for the gas in an interstate sale. The producers could not qualify for the "small producers" rate established for gas sales in interstate com-

the NGPA, "[t]he balance Congress struck already took into account the conflicting interests of producers and consumers." *Pennzoil*, 645 F.2d at 379. Congress was well aware of the economic impact on consumers that would result from the operation of indefinite price escalator clauses. The decision to permit contract clauses to raise prices to a ceiling constitutes a clear legislative statement that the resulting high cost to the consumer is not contrary to federal energy policy.

### B. *Wyoming Public Policy*

█ We must look to the statutes and judicial decisions in Wyoming to determine that state's public policy with regard to the price escalation clause in this case. *See Taylor v. State*, 612 P.2d 851, 865 (Wyo. 1980) (Rooney, J., concurring).

Although Congress specifically legislated in the NGPA regarding pricing of intrastate gas, it nevertheless provided that states may restrict the operation of indefinite price escalator clauses if they choose to do so. *See* 15 U.S.C. § 3432(a).[8]

> "The conference agreement also cedes the Federal Government's authority to further limit the operation of indefinite price escalator clauses to State governments wishing to do so. The Congress, by adoption of this section, recognizes the right of States to prescribe more stringent limitations on the operation of such clauses than those prescribed herein."

H.R. Conf. Rep. No. 1752, 95th Cong. 2d Sess. 83, *reprinted in* 1978 U.S. Code Cong. & Ad. News 8983, 9000.

Some states have exercised their right to alter the public policy expressed in the NGPA by enacting greater restrictions on the use of indefinite price escalation clauses. *See, e.g.,* Kan. Stat. Ann. 1980 Supp. § 55–1401 *et seq.; Energy Reserves Group v. Kansas Power & Light Co.*, 630 P.2d 1142, 1150–53 (Kan.1981). We believe it is significant that the Wyoming legislature has not enacted any restrictions on the operation of clauses such as the one at issue in this case.

Moreover, in *Amoco Production Co. v. Stauffer Chemical Co.*, 612 P.2d 463 (Wyo. 1980), the Wyoming Supreme Court approved the enforcement of a favored nations clause contained in an intrastate gas contract. Contrary to the assertion of the trial court in this action, the briefs of the parties in *Stauffer* reflect that the issue whether favored nations clauses are against public policy was argued to the Wyoming court in that case. Despite the public policy argument, the Wyoming Supreme Court ordered the clause to be given effect, stating that

> "[f]avored nations clauses are a common feature of gas purchase and sale contracts. The nature of the product and its questionable availability engenders reluctance on the part of producers to enter into long term contracts at the price prevailing at the time of contract. Yet purchasers require long term commitments to insure an adequate supply of gas. A two-party favored nations clause provides an increase in price to match any higher price which the purchaser pays to any other seller. A third-party favored na-

merce, which was set at 130% of the ceiling rate established for large producers. *See* F.P.C. Opinion No. 742 (Aug. 28, 1975). However, paragraph 6(b), by pegging the contract cost to the price received by *any* producer selling interstate gas, allowed the producers to receive the "small producers" rate for intrastate sales. Moreover, paragraph 6(b) contains no vintaging distinction between old and new gas. The ceiling rates for old gas sold in interstate commerce are lower than those for new gas. *See American Pub. Gas Ass'n v. FPC*, 567 F.2d 1016, 1033 (D.C. Cir. 1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978). Through the operation of 6(b), therefore, the producers here could receive the new

gas rate for old gas. *See Amoco Prod. Co. v. Stauffer Chem. Co.*, 612 P.2d 463, 466 (Wyo. 1980).

**8.** This section provides:

"§ 3432. Effect on state laws.

"(a) Authority to prescribe lower maximum lawful prices.—Nothing in this chapter shall affect the authority of any State to establish or enforce any maximum lawful price for the first sale of natural gas produced in such State which does not exceed the applicable maximum lawful price, if any, under subchapter I of this chapter."

tions clause requires the purchase to match any higher price contracted to be paid by any other buyer in the same field or area.... Favored nations clauses are recognized by the courts. *Superior Oil Company v. Western Slope Gas Company*, 10th Cir. 1979, 604 F.2d 1281; *Holly Sugar Corporation v. Fritzler*, 42 Wyo. 446, 296 P. 206 (1931); *Texas Gas Transmission Corporation v. Shell Oil Company*, 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960).

" . . . The principal objective of [a third party favored nations clause] is to escalate the agreed price to equal the *highest* price being paid for the commodity by any other purchaser."

*Stauffer*, 612 P.2d at 468 (footnotes omitted) (emphasis in original).

The opinion in *Stauffer* and the failure of the Wyoming legislature to alter the policy expressed by the NGPA clearly indicate that indefinite price escalation provisions are not against the public policy of the state of Wyoming. Accordingly, the trial court's conclusion that the clause at issue here offends public policy is without legal foundation.[9]

## II.

## UNCONSCIONABILITY

The trial court also held paragraph 6(b) to be unconscionable, citing section 34–21–219 of the Wyoming statutes.[10] The court's conclusion of unconscionability rests on the dramatic rise in the cost of gas resulting from the effect of the price escalator clause. The producers contend on appeal that the court used an incorrect legal standard in making its determination, and that the record contains no evidence to support its conclusion.

The leading Wyoming case on unconscionability, *In re Estate of Frederick*, 599 P.2d 550 (Wyo.1979), was inexplicably not cited or considered by the trial judge in his opinion. In *Frederick*, the Wyoming Supreme Court pointed out its "reluctance to redraw contracts for the parties," *id.* at 556, and stated that "[i]n the absence of overreaching, the court should not aid those who have made an unwise bargain in the formation of the contract." *Id.* Under Wyoming law,

"[u]nconscionability is tested as of the time the agreement is made and not in accordance with hindsight. . . . It is considered as a form of fraud recognized in equity, but such fraud should be 'apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other; which are unequitable and unconscientious bargains.' . . . The Supreme Court

9. In so stating, we have considered the concurring opinion in *Superior Oil Co. v. Western Slope Gas Co.*, 604 F.2d 1281, 1291 (10th Cir. 1979). Contrary to the concurrence, we do not view the purpose of the remand by the majority in that case to include a determination whether favored nations clauses are void as contrary to public policy. The majority opinion rests, implicitly if not explicitly, on the proposition that such clauses do not violate public policy. The majority emphasized the amicus curiae brief filed with the trial court by the Public Utilities Commission of the State of Colorado (PUC) urging that favored nations clauses *not* be declared contrary to public policy, even though they permit the price of gas to rise above a price directly related to the cost of production. The majority agreed with the PUC that "[t]he actual value of a product is determined by what people will pay for it, not by what it costs to produce." *Id.* at n.15. The majority also noted that the NGPA "provides for a free market

between producers and purchasers in the long run." *Id.* at n.16.

10. That section provides:

"(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

Wyo.Stat. § 34–21–219.

of Oklahoma has defined the test of unconscionability as whether, 'under the circumstances existing at the time of making of the contract, and in light of the general commercial background and commercial needs of a particular case, clauses are so one-sided as to oppress or unfairly surprise one of the parties.' "

*Id.* (citations omitted) (emphasis added).

█ The considerations set out in *Frederick* relevant to a determination of unconscionability are whether: 1) the protesting party was deprived of meaningful choice as to whether to enter into the contract; 2) the party was compelled to accept the terms; 3) there was opportunity for meaningful negotiation; and 4) there was gross inequality of bargaining power. *Id.* at 556. The burden is on the complaining party to "demonstrate that the clause in question was unconscionable at the time the contract was made." *W. L. May Co. v. Philco-Ford Corp.,* 543 P.2d 283, 286 (Ore.1975).

█ The commercial circumstances surrounding the execution of the supplemental agreement are evidenced by the record on appeal in this case. Mr. Magagna, the representative from Northern who negotiated the contracts with Amoco, testified that Northern could not use the additional gas at the time it was offered for sale by Amoco and sought instead to obtain a contract extension to use the gas "down the line." App., vol. I, at 62. Amoco wanted to recover the price of the gas immediately. Magagna further testified that he and the people from Amoco negotiated back and forth for several months, *id.* at 63, and that one of the benefits to Northern from the new contract was the assurance of a twenty-year supply of gas for its customers. *Id.* at 78. We note, as did the Court in *Stauffer,* 612 P.2d at 468, that favored nations clauses constitute the quid pro quo that induces producers of natural gas to enter into long-term contracts. In its statement to the Public Service Commission accompanying its submission of the contract for approval, Northern referred to the difficulty in obtaining long-term commitments, and the advantages it believed it would receive from the amended contract.[11]

---

11. That statement provided in relevant part:

"In 1957, according to our best estimates, Northern Utilities Company and Northern Gas Company had adequate gas supplies for the ensuing twenty (20) year period. Since 1957, many changes have occurred, some of the principal ones being:

*First* —Thirteen (13) years have elapsed and a substantial part of the gas supplies on hand in 1957 have been depleted and are continuing to be depleted each year . . . .

"*Second*—There has been a substantial increase in the demand of both companies for gas service . . . .

"*Third*—The national demand for natural gas has resulted in various large interstate pipelines becoming competitive for natural gas supplies available in Wyoming. These interstate companies are offering various types of bonuses in order to obtain calls on any gas which may be produced, such as participating in drilling costs, making advance payments for future gas deliveries, making interest free loans, etc. These interstate companies are agreeing to take or pay for substantial volumes of gas in the initial years in order to provide a fast well payout. These interstate companies are also agreeing to accept delivery of gas at wellhead and to install and operate, at Buyer's expense, to the extent required, all gathering, dehydrating and compression facilities. All natural gas producers are anxious to deliver substantial volumes of gas as soon as wells are completed because of the high "present worth" of money. It is very difficult for an intra-state gas distribution company, with a relatively limited market and high peak demands and a low load factor, to compete against these interstate companies and negotiate any long term gas supply contracts.

\*  \*  \*  \*  \*

"Northern Utilities, Inc., received a letter dated April 7, 1970 from Pan American Petroleum Corporation [predecessor of Amoco] relative to gas being produced at Beaver Creek Field, Fremont County, Wyoming, reading as follows:

'As provided in Article 8.(d) of the contract referenced above, Pan American hereby serves notice that it has more than 60 BCF of gas in the reservoirs identified in the contract, which exceed the maximum quantity specified in Exhibit "B".

'Pan American desires to sell the 60 BCF coextensively with the gas sales already contemplated.

'Accordingly, we invite you to exercise your right to negotiate for the purchase of the additional gas quantity.'

"As set forth in the letter Pan American Petroleum Corporation desired to market this additional gas during the next eight years.

Moreover, in a series of letters over a two-year period, Northern urged Kerr-McGee and Phillips to execute supplementary contracts with provisions identical to Northern's contract with Amoco.

The trial court found that the sharp price increases were not contemplated by Northern at the time of contracting. This finding cannot support a determination of unconscionability under Wyoming law. "The risk of the effects of inflation . . . however, is inherent in any contract which includes an option to purchase in the future. Mere increase in the value . . . does not invalidate a contract . . . ." *Frederick*, 599 P.2d at 556.

In construing the Utah provision of the Uniform Commercial Code, which is identical to Wyo.Stat. § 34–21–219 cited by the trial court here, this court reiterated that "an increase in price has nothing to do with unconscionability." *Bernina Distributors, Inc. v. Bernina Sewing Machines*, 646 F.2d 434, 440 (10th Cir. 1981). In *Bernina*, we pointed out that

> "the principle of that provision is one of 'prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power.' In order to avail oneself of the section, proof must show the contract is 'so one-sided as to be unconscionable under the circumstances existing *at the time of the making* of the contract.'"

*Id.* (quoting Uniform Commercial Code § 2–302, comment 1) (emphasis in original).

In this case, experienced negotiators for both parties entered into an agreement after several months of give-and-take. Northern was not compelled to enter into the contract and clearly believed the contract terms were to its advantage at the time of execution and for several years thereafter. Based on our review of the record, we conclude as a matter of law that Northern failed to demonstrate unconscionability under Wyoming law.

In order to provide future gas service for the customers of Northern Utilities, Inc. and of Northern Gas Company, we desired to have the production of this gas delayed until after 1978. After six (6) months of negotiations

In upholding this contract, we are mindful that "[c]ourts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginian Railway v. System Federation No. 40*, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1936). The courts have power to implement the public interest. The prerequisite to the exercise of this equitable power, however, is a determination of where the public interest lies. In this case, the rise in gas prices borne by the consumer as the result of this contract, which the trial court found so disturbing, is not contrary to either federal or Wyoming public policy, nor is it the result of unconscionability.

The decision of the trial court is reversed, and the case is remanded for further proceedings consistent with this opinion.

we have entered into the following agreements which we are submitting for filing at this time . . . ."
App., vol. II, at 125–28.