The SUPERIOR OIL COMPANY,
Plaintiff,

v.

WESTERN SLOPE GAS COMPANY,
Defendant.

CONTINENTAL OIL COMPANY,
Plaintiff,

v.

WESTERN SLOPE GAS COMPANY,
Defendant.

Civ. A. Nos. 76–F–869, 77–F–388.

United States District Court,
D. Colorado.

May 18, 1982.

**464**

Robert C. Hawley, and Gretchen A. Van-derWerf, Dechert, Price & Rhoads, Denver, Colo., for plaintiffs The Superior Oil Co. and Conoco, Inc.

Patrick F. Timmons, Houston, Tex., for plaintiff The Superior Oil Co.

Thomas Burton, and Joseph C. Johnson, Houston, Tex., for plaintiff Conoco, Inc.

James R. McCotter, Kelly, Stansfield & O'Donnell, Denver, Colo., for defendant Western Slope Gas Co.

Eugene C. Cavaliere, Asst. Atty. Gen., Denver, Colo., for amicus curiae Public Utilities Com'n of State of Colo.

Thomas M. Blume, and Thomas L. Barton, Denver, Colo., for amicus curiae Phillips Petroleum Co.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge:

This matter is before the court on cross-motions for summary judgment concerning the validity of a two-party "favored nations" clause [1] in an intrastate gas purchase agreement. These motions raise the question of whether this clause is violative of public policy. For the reasons set forth herein, we hold that the favored nations clause contained in the parties' Gas Purchase Agreement is valid and grant partial summary judgment in favor of Plaintiffs.

### BACKGROUND

For the purpose of these motions, we have consolidated two separate cases which involve identical questions of law and the same defendant, Western Slope Gas Company ("Western Slope"). Plaintiffs are The Superior Oil Company ("Superior") and Continental Oil Company (now Conoco, Inc.).[2]

In January, 1964 Plaintiffs entered into twenty-year Gas Purchase Agreements with Western Slope in which Plaintiffs agreed to sell and Western Slope agreed to buy natural gas from production in Rio Blanco County, Colorado. Both Agreements contained a provision which is commonly referred to as a "favored nations" clause:

8.4 *Favored Nations Clause.* If, at any time during the term of this agreement, buyer pays to a producer of natural gas in Mesa, Garfield, and Rio Blanco Counties, Colorado, for the purpose of reselling such gas in its Colorado market area, a price per Mcf higher than that being paid to seller hereunder, due consideration being given to the quality of the gas, basis

---

1. A two-party favored nations clause is one method of indefinite price escalation utilized in long-term contracts for the sale of natural gas. Two-party favored nation clauses provide that the price per Mcf (one thousand cubic feet) to be paid to a producer of natural gas will be increased to match any higher price contracted to be paid by the same buyer to any other producer in the same area. Third-party claus-es, on the other hand, require a buyer to pay the producer any higher price contracted to be paid to any other producer by *any other buyer* in the same area. 4 H. Williams, *Oil and Gas Law,* ¶ 726 (1972).

2. Superior and Continental will hereinafter be referred to collectively as "Superior" or "Plaintiffs".

of measurement, delivery pressure, and other conditions of sale, buyer shall, commencing upon the date of the first delivery of such natural gas at such higher price, and continuing so long as such higher price is paid for such gas, increase the price being paid to seller hereunder to equal such higher price . . . .

The Agreements also contain "intrastate utilization" sections (¶ 7.1) which provide that Western Slope "represents that it is engaged solely in intrastate transportation of natural gas within the State of Colorado and represents that gas purchased herein shall be sold and used only in connection therewith."

The favored nations clause was triggered on several occasions as a result of Western Slope paying a higher price per Mcf to other producers in the contract area. The first was November 14, 1971[3] when Western Slope began paying another producer the ceiling rate of 23.5 cents per Mcf, which ceiling price was set forth in FPC Order 435. The favored nations clause was also triggered when, on May 15, 1974, Western Slope began paying another producer in the contract area 35 cents per Mcf. On June 21, 1974 the Federal Power Commission, in Opinion No. 699, established a rate of 50 cents per Mcf for gas produced from wells commenced on or after January 1, 1973. Pursuant to this Opinion, Western Slope contracted with other producers within the contract area, whose wells were commenced after January 1, 1973, for natural gas at 50 cents per Mcf. However, when demand was made by Superior for that higher price under their favored nations clause, Western Slope refused on the grounds that "vintaging"[4] had been established as a requirement in the pricing of natural gas. Western Slope felt Opinion 699 did not trigger the favored nations clause in Superior's Agreement since production from plaintiff's wells was commenced *before* January 1, 1973.

Superior filed suit against Western Slope on September 3, 1976 alleging breach of the Gas Purchase Agreement as a result of Western Slope's refusal to pay higher price per Mcf under the favored nations clause. Western Slope filed a Motion for Summary Judgment on the grounds that the favored nations clause was not triggered because "vintage" was a "condition of sale" in the parties' Gas Purchase Agreement. On July 29, 1977 we granted Western Slope's Motion for Summary Judgment, holding as a matter of law that its interpretation of the Agreement was correct and that vintaging was an "essential factor in determining comparability of gas for purposes of the favored nations clause." The United States Court of Appeals for the Tenth Circuit reversed our Order on August 13, 1979 and remanded the case to this court for further proceedings. *The Superior Oil Company v. Western Slope Gas Company,* 604 F.2d 1281 (10th Cir. 1979).

Subsequent to remand from the Tenth Circuit, Plaintiffs filed a Motion for Partial Summary Judgment alleging that the favored nations clause in the Gas Purchase Agreement was valid and that the only factual dispute remaining concerned the amount of damages. Shortly thereafter, Western Slope filed a Motion for Summary Judgment in which it maintained that, as a matter of law, the favored nations clause was unenforceable as being in violation of public policy. Additionally, Western Slope has continued to maintain that the question of the appropriate interpretation of the favored nations clause is still properly before this court.

I.

█ Western Slope argues that the net effect of the Tenth Circuit's "interlocutory"

---

**3.** Superior was actually notified of this increase on October 24, 1972. However, Western Slope made the increase retroactive to November 14, 1971.

**4.** Vintage dates refer to the date when wells are drilled, with ceiling rates being lower for older

wells. Testimony indicated that the concept evolved with the gradual replacement of cost-based pricing with incentive-based pricing. A higher price was authorized for "new" gas to encourage the exploration and development of new reserves.

order in *Superior Oil Company v. Western Slope Gas, supra.,* was to place the proceeding before this court in the same posture it would have been had we denied it's Motion for Summary Judgment. Had that happened, Western Slope contends, it would have been entitled to introduce at trial additional evidence concerning the meaning of the phrase "other conditions of sale" in the favored nations clause. While testimony concerning the parties' intent in including the language "other conditions of sale" in the favored nations clause was presented at the hearing, we now hold that the question of whether "vintaging" is a "condition of sale" is not before this court.

Western Slope relies on several cases out of the United States Court of Appeals for the Fifth Circuit for its proposition that we may consider the contract interpretation issue on remand and reach a result different from that reached by the Tenth Circuit in *Superior Oil.* Those cases are *Braniff v. Jackson Ave.-Gretna Ferry, Inc.,* 280 F.2d 523 (5th Cir. 1960); and *E.C. Ernst, Inc. v. General Motors Corp.,* 537 F.2d 105 (5th Cir. 1976). However, a careful reading of these cases reveals that they are clearly distinguishable from the present case. In *Braniff* the Court of Appeals reversed the district court's decision granting a defendant's motion for summary judgment. They held that summary judgment was not proper because conflicting inferences or reasonable doubt could be drawn from the facts set out in the affidavits supporting and opposing the summary judgment motion. It was held to the "imperative duty" of the district court to test the case against the actual evidence adduced at every stage of the trial. 280 F.2d at 529.

The *E.C. Ernst* case presents a situation slightly more analogous to the present controversy. The Appellant in *Ernst* appealed from the entry of summary judgment in favor of the defendant. The Fifth Circuit reversed that order and remanded the case back to the district court. *E.C. Ernst, Inc. v. General Motors Corp.,* 482 F.2d 1047 (5th Cir. 1973) ["*Ernst I*"]. On remand, Appellant argued that the Circuit's reversal of the summary judgment precluded the de-

fendant from raising the same issues as a defense. The district court allowed the defense and, following an adverse decision, Appellant again filed an appeal. In the second *Ernst* case the Fifth Circuit made it clear that *Ernst I* had "stopp[ed] short of expressing any opinion as to how the trier [of the fact] should resolve the issue ultimately . . ." 537 F.2d at 107. They had reversed the district court in *Ernst I* because Appellant had "demonstrated to [their] satisfaction that genuine issues of triable fact [were] in existence." *Id. Ernst I* was binding on the district court only with respect to the existence of a genuine triable issue of fact. Having found that to exist, it remained the "imperative duty" of the district court to receive evidence on that issue. *Id.* at 108.

In *Superior Oil,* the Tenth Circuit agreed with our initial determination that there were no disputed issues of material fact on the question of contract interpretation. 604 F.2d at 1288, n. 12. Thus, our decision on Western Slope's Motion for Summary Judgment was not reversed for the reasons stated in either *Braniff* or *Ernst,* i.e., because of the existence of a "genuine triable issue of fact". Rather, the Tenth Circuit reversed because "on the facts of this case, the phrase 'other conditions of sale' in Article 8.4 of the contract between the parties does not include vintaging . . . ." *Id.* at 1291. Having found no disputed issue of material fact, the decision of the Tenth Circuit was on the merits of Western Slope's claim. We are bound by their determination that vintaging was not a condition of sale contemplated by the parties.

There has also been some question raised regarding the posture of this case on remand vis-a-vis the public policy issue. In a footnote of a recent decision, the Tenth Circuit stated:

We have considered the concurring opinion in *Superior Oil Co. v. Western Slope Gas Co.,* 604 F.2d 1281, 1291 (10th Cir. 1979). Contrary to the concurrence, we do not view the purpose of the remand by the majority in that case to

include a determination whether favored nations clauses are void as contrary to public policy. The majority opinion rests, implicitly if not explicitly, on the proposition that such clauses do not violate public policy.

*Kerr-McGee Corp. v. Northern Utilities, Inc.,* 673 F.2d 323, 328 n. 9 (10th Cir. 1982). In *Kerr-McGee* the Circuit panel comprised of Chief Judge Seth and Judges Holloway and Seymour held that a third-party favored nations clause was not void as against either federal or Wyoming public policy. Not specifically before that Court was the question presented herein: is the parties' two-party favored nations clause, interpreted not to include vintaging as a condition of sale, inconsistent with federal or Colorado public policy.

■ Contrary to the footnote in *Kerr-McGee, supra,* we do not view Judge Miller's[5] majority opinion in *Superior Oil* to preclude our determination of the public policy issue in this case. This appears to be an accurate assessment for several reasons. First, the public policy issue was not before the Circuit in Plaintiff's appeal from our Order granting Western Slope's motion for summary judgment. In fact, we expressly stated in that Order that "[w]e express no view as to whether favored nations clauses are void as a matter of public policy." While Judge Barrett, in his concurring opinion, commented on this question, this does not alter the fact that public policy was not an issue on appeal. Moreover, Judge Barrett prefaced his remarks with the assumption that we *would* be considering the public policy issue on remand.

Second, Western Slope filed a Petition for a Rehearing *En Banc* of the Circuit's decision in *Superior Oil.* In denying the Peti-

tion on September 27, 1979 the Court stated:

The Court recognizes the importance of the question raised by appellee [Western Slope] over whether the particular favored nations clause involved in this case is void for reasons involving public policy, but believes that *such a question should not be decided by this Court in the absence of a fully-developed record and decision of the District Court.* (Emphasis supplied).

We conclude that the public policy question is before this court on remand, and proceed to a discussion and resolution of that issue.

II.

Our determination is thus limited to the question of whether this favored nations clause, without vintaging as a condition of sale, is void as against public policy. The question has been fully briefed[6] and, since we are of the view that there are no issues of material fact present in connection with the validity of the favored nations clause, summary judgment is appropriate.[7] *Webbe v. McGhie Land Title Company,* 549 F.2d 1358 (10th Cir. 1977); *Williams Petroleum Company v. Midland Cooperatives, Inc.,* 539 F.2d 694 (10th Cir. 1976). If we find that this clause is void as against public policy we must grant summary judgment in favor of Western Slope. However, if we find that the clause is valid, Plaintiffs are entitled to summary judgment and the case will proceed to a determination of the amount of damages.

■ Before reaching the merits of the contentions of the parties, a few comments on the Court's function and standards in measuring contracts against public policy

---

**5.** The Honorable Jack R. Miller, Judge of the United States Court of Customs and Patent Appeals, was on the panel in *Superior Oil* by designation. The others on the Panel were Judges McWilliams and Barrett.

**6.** We granted leave to the Colorado Public Utilities Commission ("PUC") and the Phillips Petroleum Company ("Phillips") to file *amicus curiae* briefs. PUC argues that this favored nations clause is contrary to public policy while

Phillips urges that we uphold the validity and necessity of such clauses.

**7.** At one point in the proceedings following remand, Western Slope alleged that there were contested issues of fact surrounding the public policy question. In light of its allegations of no material facts in dispute in its own Motion for Summary Judgment, we find Western Slope's allegation to be wholly without merit.

are appropriate. Early in this century, the Colorado Supreme Court declared that "before ... a contract can be declared illegal upon the ground that it is against public policy, it must clearly appear that it is obnoxious to the pure administration of justice, or manifestly injurious to the interests of the public." *Wood v. Casserleigh,* 30 Colo. 287, 71 P. 360, 361 (1902). In *Mitchell v. Jones,* 104 Colo. 62, 88 P.2d 557, 560 (1939), the Colorado Supreme Court admonished that:

> Before a court should determine a contract which has been made in good faith stipulating for nothing that is *malum in se,* nothing that is made *malum prohibitum,* to be void as contravening the policy of the state, it should be satisfied that the advantage to accrue to the public for so holding is certain and substantial, not theoretical or problematic.

It has not been disputed that the Gas Purchase Agreement, and the favored nations clause contained therein, in this case was the result of arms length negotiations between parties of equal bargaining strength. Since the contract was one involving intrastate transportation of natural gas only, it was not subject to the FPC's proscription on indefinite price escalation clauses and, hence, was not *malum prohibitum.* Nor can we say, as between the parties, that the contract was inherently wicked or evil. However, it is also true that parties to private contract cannot abrogate conditions affecting the public policy of the state. *University of Denver v. Industrial Commission of Colorado,* 138 Colo. 505, 335 P.2d 292, 294 (1959).[8]

■ Basic to our decision on the validity of the questioned clause is the proposition that one of the essential freedoms of citizenry is the right to bargain and contract. Our commercial society requires that each party be permitted to bargain in its own interest and that such bargains will be upheld by courts of law so long as they are founded upon relatively equal bargaining

positions and are not manifestly unjust or injurious to the general welfare of the populace as a whole. Until fully and solemnly convinced that an existent public policy is clearly revealed, a court is not warranted in applying that principle of public policy to void a contract. *See* Winfield, *Public Policy and the English Common Law,* 42 Harv.L. Rev. 76. Further,

> It has been well said 'that the right of private contract is no small part of the liberty of the citizen, and that the usual and most important function of the courts of justice is ... to maintain and enforce contracts [rather] than to enable parties thereto to escape from their obligations on the pretext of public policy unless it clearly appears that they contravene public right or the general welfare.'

*Bartron v. Codington County,* 68 S.D. 309, 2 N.W.2d 337 (1942), *quoting Baltimore & Ohio S.W. R. Company v. Voight,* 176 U.S. 498, 20 S.Ct. 385, 44 L.Ed. 560 (1900).

### A.

Western Slope's basic position, both in its briefs and at the hearing, is that a favored nations clause without vintaging as a condition of sale is inherently unreasonable and incompatible with the public interest. Western Slope contends that such a clause operates to raise the price to the seller irrespective of any increase in production costs. This "windfall" to the seller results in an unjustified increase in the price to the ultimate consumer. Such price increases create special hardships for the elderly and others on fixed incomes. In support of Western Slope's position, *amicus* PUC agrees with the assessment made by Judge Barrett in *Superior Oil, supra.*

> "There is a concensus among the courts and agencies, both at the state and federal levels, that 'Favored Nation' clauses are contrary to public interest, and that they cause excessive and unreasonable price increases which operate in a 'me-

---

8. It has been said that public policy "is a very unruly horse, and when once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail." *Richardson v. Mellish,* 2 Bing. 229, 252 (1824) (Burrough, J.). Nevertheless, however unruly the horse, the Judge may not refuse to ride it.

chanical and arbitrary manner' and lack 'any substantial relationship to the factors which bear on the value of gas or on the determination of a reasonable level of rates for it.' "

604 F.2d at 1296 (Barrett, J., concurring). PUC submitted that if indefinite price escalator clauses in interstate contracts are contrary to public policy because they resulted in charges for natural gas which the FPC found to be unjust and unreasonable, then such clauses in intrastate contracts are likewise contrary to public policy. Finally, PUC asserts that favored nation clauses contribute to instability and uncertainty concerning the price of natural gas and the expansion of services by natural gas companies.

### B.

Plaintiffs maintain that this favored nations clause is not a "one-way street" favoring only the natural gas producer. Instead, they argue, such a clause provides important protection to both parties to a gas purchase contract. Because gas purchasers must make substantial capital outlays in order to move the gas product to the retail consumer, they require some assurance that sufficient long-term supplies of gas will be available to them. In return for making such a long-term commitment of natural gas supplies, producers must have the assurance that they will receive a fair market value for their product throughout the duration of the contract. Plaintiffs point out that, while the FPC did express opposition to indefinite price escalation clauses in interstate gas contracts, its successor, the Federal Energy Regulatory Commission ("FERC"), has upheld the validity of such clauses in intrastate contracts.[9] In sum, Plaintiffs argue that Western Slope should

not be permitted to escape the terms of the Gas Purchase Agreement, which was the result of arms length negotiation, by raising the spectre of public policy.

*Amicus* Phillips argues that favored nation clauses advance the public interest by facilitating the production of natural gas. It contends that, since the pressure for long-term contracts comes from buyers of natural gas, indefinite price escalation clauses prevent price discrimination and permit upward adjustments in price over lengthy periods. Phillips further contends that favored nation clauses are necessary to insure long-term commitments without the risk that a producer will be locked into an unfavorable contract with a market dominating buyer.

### C.

While the briefing has been very extensive on this question, neither party had endeavored to support their conclusory allegations with affidavits or other confirmatory evidence. For this reason, we determined that an evidentiary hearing was necessary for the proper determination of these motions. We requested the testimony at the hearing to focus on the consequences and effects of enforcing this favored nations clause, including testimony on the impact to the ultimate customer of Public Service Company of Colorado.[10] In light of the majority's opinion in *Superior Oil, supra,* that "the cost of production of a product often bears little or no direct relationship to the true value of the product" [604 F.2d at 1291, n. 15], we precluded evidence of Plaintiff's cost of production as irrelevant.

Western Slope attempted to focus its public policy argument on testimony con-

---

**9.** The FERC is the successor agency to the FPC under the National Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. § 3301 *et seq.* The contract under scrutiny in this case involves solely intrastate transportation of natural gas but is now subject to FERC regulation. 15 U.S.C. § 3315. The FERC's expertise in this area, as well as that of its predecessor, is useful in analyzing the public policy ramifications of this dispute.

**10.** Public Service Company of Colorado ("PSC"), Western Slope's corporate parent, buys its natural gas from Western Slope and recovers that cost through rates charged its customers. Testimony indicated that PSC provided over eighty percent of the natural gas to its customers in its "Western Division" (Including Palisade, Fruita, and Grand Junction) while the remaining twenty percent was sold directly by Western Slope.

cerning the effect of the favored nations clause on the natural gas consumers in western Colorado. John H. Hassoldt, Vice President and General Manager of Western Slope, testified that, as of June, 1981, the total liability of Western Slope, assuming the favored nations clause is enforced as urged by Plaintiffs, was $5,095,000. At the time of the hearing, approximately $4.3 million of this liability had been "flown through" to the western division customer of PSC pursuant to a "rate rider" authorized by the PUC in Decision No. 91256, entered September 7, 1977. Taking into account the future potential liability to Plaintiffs, as well as the potential liability to other producers with similar contract provisions, Mr. Hassoldt estimated that by 1984 Western Slope's liability as a result of this clause would be $25 million.

Donald M. Johnson, Consumer Service Manager for the Western Division of PSC, testified that approximately ninety percent of the Palisade-Fruita-Grand Junction area utilized natural gas for their residential needs. Through June, 1981 the average total cost per Mcf paid by those customers was $2.75. Of this price, an estimated $0.1236 was attributable to the flow-through of Plaintiff's favored nations claim. (Defendant's Exhibits I and O). The price of natural gas had increased from calendar year 1979 to calendar year 1980 by over forty percent. However, Mr. Johnson testified that consumption for the same period was down approximately 25 Mcf's per customer. He also noted that natural gas was still much cheaper than either electricity, propane, or fuel oil and that western division customers were paying about the same price per Mcf as comparable customers in Denver.

Western Slope entered into evidence the deposition testimony of John W. King. (Defendant Exhibit Q). Mr. King is a resident of Grand Junction and a retired motel manager. He testified from the position of a customer of PSC's Western Division, utilizing natural gas to heat his home. Mr. King testified that he lives on a fixed income comprised of Social Security retirement benefits and some personal savings. His basic testimony was that persons on fixed income can hardly pay their utility bills at present, let alone with additional increases. While he recognized that he was already paying an increased rate as a result of PSC's flow-through, Mr. King stated that his "primary concern" was the refund PSC would give if Western Slope were successful in this suit.[11]

Plaintiffs did not challenge the assertion that enforcement of the favored nations clause in this case will result in higher natural gas prices to the western division customers. They did note, however, that even with the present increase due to the "flow-through" the western division customers were still paying significantly less than natural gas consumers in Denver and the forty-five largest U.S. cities. (Testimony of Mr. Radford Schantz).

The primary focus of Plaintiff's case was the determination of the national public policy concerning natural gas pricing and whether the parties' favored nations clause, as interpreted by Plaintiffs, is violative of that public policy. In support of their contention that the clause is not contrary to public policy, Plaintiffs presented the testimony of three economic and energy-related experts: Fred C. Sweat, a natural gas marketing consultant; Radford Schantz, an economic energy and utility consultant; and, David Crump, Professor of Law at the University of Houston.

All three agreed that the purpose of price escalation clauses, including the indefinite two-party type in this case, is to keep the price of natural gas at approximately the competitive market level over the life of the long-term contract. They were also strenuously in agreement that the value of natural gas is what the marketplace puts on it;

---

11. One of the conditions set by the PUC is authorizing PSC to attach a "rate rider" to the cost of natural gas in 1977 was that, if Western Slope succeeded in defending this suit, PSC must file an appropriate refund plan within thirty days of completion of the litigation. (Defendant's Exhibit H)

the cost of production is not the basis of "value". In their opinions, the natural laws of supply and demand create the best reflection of the value of natural gas. When gas is artificially priced below the customer's expectation, as was felt to be the case throughout the FPC's tight regulation of the industry, the customer will demand more natural gas. However, low prices provide no incentive to the producers to explore and develop new natural gas reserves. Thus, in time, the proved reserves are depleted, resulting in the kind of natural gas shortage experienced in the United States in the mid-1970's.

Even Western Slope's witnesses had to agree that higher prices would normally act as an incentive to produce new gas reserves. Mr. Schantz argued that higher prices also reduce the demand for the commodity. The result would be the balancing of supply and demand, with the value of the gas existing at the competitive market level. The testimony was that the gradual movement for decontrol of the natural gas industry, culminating in passage of the NGPA in 1978, was intended to correct the traditional underpricing of natural gas, provide an incentive to rebuild our gas reserves, and balance out supply and demand. All Plaintiff's witnesses stated that the assurance of adequate supplies of natural gas at a reasonable price was the public policy of this country.

In addition to such clauses not being against public policy, Plaintiffs maintained that such clauses were vital to the natural gas industry as presently structured. Long-term supplies of natural gas are necessary before a regulatory agency will issue a certificate of public convenience and necessity to a pipeline who desires to build or expand his transmission system. Investment bankers, who must provide the initial capital to finance a system, require a long-term supply of natural gas in order to assure the recapture of long-term debt to amortization and appreciation of the pipeline facilities. Aside from the assurance of an adequate supply of natural gas, Professor Crump testified that the consumer benefits in another way from the utilization of price escalation clauses. Such a clause induces a producer to enter into a contract for the sale of natural gas at a much lower initial price, and for a longer term. Without such a clause, the producer is in effect being asked to assume one hundred percent of the risk of the contract. That is a risk the producer will want to be compensated for in terms of a significantly higher contract price from the very beginning.

## IV.

Western Slope has relied, in part, on the decisions of the FPC to support its contention that favored nation clauses are viewed with disfavor and have been declared to be violative of public policy. In the same light, Plaintiffs rely on recent decisions of the FERC as indicative of a changing policy with regard to such clauses. While the FPC had no jurisdiction over intrastate contracts, and the FERC only limited jurisdiction, their decisions are informative as to the factors relevant to our present inquiry.

In 1961 the FPC issued Opinion No. 341 in *Pure Oil Company,* 25 FPC 383, *reh. denied,* 25 FPC 774, *aff'd,* 299 F.2d 370 (7th Cir. 1962). Considering all the circumstances in that case, the FPC held that the two-party favored nation clauses in Pure's contracts, and indefinite price escalation clauses generally, were contrary to the public interest. The FPC indicated that such clauses were inherently unreasonable in that they lacked "any substantial relation to the factors which bear on the value of gas or on a determination of a reasonable level of rates for it ..." 25 FPC at 389. In response to Pure's contention that favored nation clauses give effect to free market conditions, the FPC stated, "escalation provisions such as Pure's are the opposite of giving effect to prevailing market prices; instead, the price for sales of one or a few particular producers apply to increase the level of market prices generally." Id. at 391. Finally, the FPC observed:

Assuming that indefinite escalation clauses in producer contracts had some justification years ago when a lack of

purchaser outlets and lack of consumer demand forced prices to abnormally low levels, this justification no longer exists today, when purchasers of gas are numerous, consumer demand is strong, and buyers are competing eagerly for available supplies of gas. In our judgment, in the light of continuing increases in the price of gas in recent years and the present high level of prices, escalation clauses such as Pure's have by now outlived whatever economic function they may have had.

*Id.*

Also in 1961, the FPC, by Order No. 232A [12], formally amended its regulations to prohibit all indefinite price escalation provisions in natural gas contracts subject to its jurisdiction. The FPC did note, however, that limited price redeterminations were in the public interest and appropriate to meet the difficulty of pricing for long and unpredictable periods and to encourage the negotiation of long-term contracts. 25 FPC at 610. In *Federal Power Commission v. Texaco,* 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), the Supreme Court implicitly upheld Order No. 232A when it held the FPC justified in rejecting without a hearing an application for a certificate of convenience which disclosed price clauses impermissible under Order No. 232A.

The FPC relaxed its total prohibition on indefinite price escalation clauses in interstate gas contracts with the adoption of "area maximum rate" pricing in the *Permian Basin Area Rate Cases.* 34 FPC 159 (1965). The use of such clauses was prohibited only insofar as they operated to increase prevailing contract prices above the applicable area maximum rate. The action of the FPC in these cases was affirmed by the Supreme Court. *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

Congress passed the Natural Gas Policy Act, 15 U.S.C. § 3301 *et seq.,* in 1978. Pursuant to this Act, the FPC was succeeded by the Federal Energy Regulatory Commission. For the purposes of this discussion,

two relevant changes occurred with the passage of the NGPA. First, the FERC obtained jurisdiction over existing intrastate gas contracts [15 U.S.C. § 3315] and, second, rather than prohibit the utilization of indefinite price escalation clauses, the NGPA recognized their use and set maximum lawful price increases pursuant to such clauses. [15 U.S.C. § 3315(b)(3)]. Recent decision of the FERC, and the regulations promulgated under NGPA, permit indefinite price escalation clauses to function according to their terms so long as they do not operate to raise the price above the NGPA maximum lawful price. *See Kansas Power & Light Company v. Mesa Petroleum Company,* No. GP 79–4 (FERC August 10, 1979); *also* 18 C.F.R. § 270.205(b)(1). The current position of Congress and the FERC appears in stark contrast to the earlier FPC rulings.

The most recent case concerning the validity of indefinite price escalation clauses is *Kerr-McGee Corp. v. Northern Utilities, Inc.,* 673 F.2d 323 (10th Cir. 1982). That case dealt with whether a third-party favored nations clause was void as against public policy. The Tenth Circuit noted that, prior to the enactment of NGPA, the public policy with regard to intrastate gas contracts was to allow the "competitive forces of the market place to set the price" of natural gas. 673 F.2d at 325. Recognizing that the operation of indefinite price escalation clauses under the NGPA would result in higher prices to the consumer, the Court nonetheless held:

Congress was well aware of the economic impact on the consumers that would result from the operation of indefinite price escalator clauses. The decision to permit contract clauses to raise prices to a ceiling constitutes a clear legislative statement that the resulting high cost to the consumer is not contrary to federal energy policy.

*Id.* at 327. That "federal energy policy" was to promote energy conservation while, at the same time, encourage the develop-

---

12. 25 FPC 609 (1961)

ment of alternative energy sources. It was felt that "[h]igh energy prices provide one motivation to conserve energy." *Id.* at 326. The ceiling prices set by the NGPA were found to "clearly comport" with the public interest as determined by Congress. *Id.; also Pennzoil Company v. FERC,* 645 F.2d 360 (5th Cir. 1981).[13]

While the Tenth Circuit's majority opinion in the present case did not address the public policy question, some portions of that opinion are instructive to our inquiry. Of primary importance was the Circuit's determination that the value of natural gas is not necessarily related to the cost of production of that commodity. "Supply and demand are the conventional determinants . . . . [t]he actual value of a product is determined by what people will pay for it, not by what it costs to produce." *Superior Oil, supra,* at 1291, n. 15; *see also Amoco Production Company v. Kansas Power & Light Company,* 505 F.Supp. 628, 639 (D.Kan.1981).

## V.

▮ On the basis of the extensive briefing on this question, the evidence adduced at the hearing, and the recent pronouncements of the Tenth Circuit, we hold that the two-party favored nations clause in this case is not contrary to public policy. Thus, it is enforceable as interpreted by Plaintiffs.

There was never any question in this case that the respective parties entered into the Gas Purchase Agreement from essentially equal bargaining positions. Testimony indicated that the disputed favored nations clause became part of that Agreement only after serious negotiations. As we noted, *supra,* a contract freely bargained for should not be voided by a court on public policy grounds unless there is a clear showing of a certain and substantial harm to the public. *Mitchell v. Jones,* 104 Colo. 62, 88 P.2d 557 (1939). Western Slope has not

clearly demonstrated that this favored nations clause, as interpreted by Plaintiffs and the Tenth Circuit in *Superior Oil, supra,* is either unreasonable or contrary to public policy.

While the federal policy in the early 1960's might have been for tight regulation of interstate contracts, with pricing required to be essentially cost-based, testimony indicated a trend in the middle-1970's toward incentive-based pricing. This is reflected in the passage of the NGPA with the ultimate goal of total deregulation of the natural gas industry. This court must be "cognizant of these developments in public policy." *Amoco Production Company v. Kansas Power & Light Company, supra,* at 639.

Western Slope's argument that the absence of vintaging as a "condition of sale" may render price increases under a favored nations clause unreasonable as unrelated to a justifiable rise in production costs is without merit. Plaintiff's did not dispute the claim that a producing well results in very little additional expense to the producer. However, favored nation clauses were not primarily utilized to allow the producer to recoup non-existent rising expenses from "flowing gas". Instead, such clauses were included in long-term gas contracts in recognition of the fact that the "value" of that gas will in all likelihood increase over the life of the contract due, in part, to depleted supplies and increased demands. Thus, price escalation clauses serve as an incentive to the producer to enter into a twenty-year contract and to assure that the producer receives the market value of the commodity for the life of the contract.

Western Slope's argument ignores the primary concerns of current American energy policy. Congress has legislated that the focus of that policy will be the conservation of our existing natural resources and the incentive to explore for and develop new reserves. The method utilized by Congress

---

**13.** The Court reached the conclusion that the favored nations clause in *Kerr-McGee* was not violative of public policy even though it would allow Kerr-McGee to receive "new" gas prices for flowing gas. Like this case, that favored nations clause did not contain "vintaging" as a condition of sale. *Id.,* at 326–327, n. 7.

to help achieve this policy is the gradual deregulation of the natural gas industry. According to persuasive testimony at the hearing, deregulation should allow traditionally underpriced natural gas to more closely reflect its actual market value. Explicit within Congress' efforts in this regard is its intent that indefinite price escalation clauses be permitted to operate "according to their terms" so long as the price increases do not exceed established ceiling rates. 15 U.S.C. § 3315; 18 C.F.R. § 270.205(b)(1).

The alleged "substantial" injury to the public is higher prices for natural gas, which price increases are unrelated to justifiable costs of production. As the weight of the testimony reflected, the cost of production is not the accurate measure of the value of natural gas. In passing the NGPA, Congress agreed that the value, and thus the price, of natural gas will be set by supply and demand. It is agreed by all that this will result in increased gas prices to the consuming public and, in some instances, increased hardships to those on fixed incomes. However, Congress took into account the conflicting interests of consumers and producers when it sought a viable national energy policy. It struck the balance in favor of a measure directed to conserve our resources and encourage the development of alternative energy sources. See *Kerr-McGee v. Northern Utilities, supra,* at 326–27; *Pennzoil Company v. FERC, supra.* In light of this expression of Congress, we cannot find that increased cost to the consumer for natural gas alone is sufficient harm to render the favored nations clause in this case void as contrary to public policy. Without a showing by Western Slope that certain and substantial harm would result to the public from the enforcement of this clause, Plaintiffs are entitled to have the clause enforced according to it terms.

## VI.

■ Western Slope also contends that the parties' favored nations clause is violative of the public policy of the State of Colorado. A finding that the clause is not contrary to federal public policy under the NGPA does not necessarily dispose of the state public policy issue. Section 602(a) of the NGPA [15 U.S.C. § 3432(a)] provides that nothing in the Act "shall effect the authority of any State to establish or enforce any maximum lawful price for the first sale of natural gas produced in such State which does not exceed the applicable maximum lawful price, if any, under title I of this Act." Thus, a state may restrict the operation of indefinite price escalation clauses if it chooses to do so. *Kerr-McGee Corp. v. Northern Utilities, Inc., supra* at 327; *see e.g.* Kan.Stat.Ann. § 55–1410, *et seq.* (Supp.1980); *Energy Reserves Group v. Kansas Power & Light Company,* 230 Kan. 176, 630 P.2d 1142 (1981).

Absent contrary legislative action, Western Slope argues, the PUC's view concerning the favored nations clause should be considered as a pronouncement of the public policy of the State of Colorado. *Amicus* PUC concurs with this position maintaining its authority is derived from Article XXV of the Colorado Constitution. This constitutional provision vests in the Colorado Public Utilities Commission "all power" to regulate public utilities in Colorado. In its *amicus* briefs to the Court, PUC has argued that favored nation clauses are consistent with public policy only to the extent that they are applied in the manner urged by Western Slope, *i.e.,* they are consistent with public policy only when factors such as vintaging are "conditions of sale". We do not agree that the statements made by the PUC in *amicus* filings with this Court are the final words on the public policy issue. Moreover, even if we gave such deference to PUC's opinion, we are of the view that the Colorado Legislature has expressed a contrary view on the pricing of natural gas and the public policy of Colorado.

By its own admission, PUC exercises no jurisdiction over the wellhead production of natural gas, which gas is then sold in intrastate commerce in Colorado. Its authority is limited to the regulation of "public utilities". The authority to administer the laws of Colorado relating to the conservation of

natural gas is expressly rescinded and withdrawn from the PUC and "unqualifiedly conferred" upon the Colorado Oil and Gas Conservation Commission under the Oil and Gas Conservation Act. C.R.S. 1973 § 34–60–101 *et seq.* In our view, it is more within the province of that Commission to speak to Colorado's natural gas policy in the absence of legislation.

Assuming, however, that the expressions of the PUC in its *amicus* briefs is entitled to consideration by this Court, those expressions would only be entitled to great weight on the public policy issue in the absence of contrary legislative action. Contrary to the arguments of both Western Slope and PUC, the Colorado Legislature has given an expression of the State's policy with regard to the pricing and allocation of natural gas. In a February 16, 1979 Act "Concerning Compliance With Federal Law and Regulations Governing the Price and Allocation of Natural Gas and Crude Oil", the Legislature amended the Oil and Gas Conservation Act to include the following:

> (2) It is further declared to be in the public interest to assure that producers and consumers of natural gas are afforded the protection and benefits of those laws and regulations of the United States which affect the price and allocation of natural gas and crude oil, including the federal "Natural Gas Policy Act of 1978", 15 U.S.C. 3301 . . .

CRS 1973, as amended, § 34–60–102(2) (Supp.1981). Thus, it has been deemed by the State Legislature that the policy of Colorado regarding the "price and allocation of natural gas" is the policy expressed by Congress in the NGPA. There is no express legislation restricting the application of specific provisions of the NGPA. The legislature apparently intended the entire NGPA, including the sections which allow indefinite price escalation clauses in existing intrastate contracts to operate "according to their terms", to exist as the public policy of Colorado.

██ In summary, it being in the "public interest" of Colorado to afford producers and consumers of natural gas the protec-

tions and benefits of the NGPA, our finding that the favored nations clause in this case is not contrary to federal public policy applies with equal force with regard to Colorado's public policy. Without a showing of some certain and substantial harm to the citizens of Colorado, Plaintiffs are entitled to have the clause enforced according to its terms.

## ORDER

IT IS HEREBY ORDERED that Plaintiff's Motion for Partial Summary Judgment is GRANTED and that Defendant's Motion for Summary Judgment is DENIED.

IT IS HEREBY FURTHER ORDERED that, because the only issue remaining for resolution is that of damages, the parties are directed to expeditiously explore settlement or, in the alternative, a stipulation as to the amount of damages. Counsel are to file with the Court by June 1, 1982 a written joint statement as to (1) the prospects for settlement, (2) stipulation as to the amount of damages, or (3) if neither of the above can be obtained, the necessity for trial on the issue of damages. Judgment will not enter at this time. Settlement or stipulation as to damages would negate further hearings on this matter and expedite entry of judgment and appeal, if any.