942 F.2d 765
 Util. L. Rep. P 26,109
McMoRan OIL and GAS COMPANY, a Delaware corporation;
Freeport-McMoRan Inc., a Delaware corporation;
and FMP Operating Company, a Texas
Limited Partnership,
Plaintiffs-
Appellees/Cross-
Appellants,
v.
KN ENERGY, INC., a Kansas corporation,
Defendant-Appellant/Cross-Appellee.
 Nos. 89-1068, 89-1098.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 19, 1991.
 
 Tucker K. Trautman, Lawrence P. Terrell, and D. Monte Pascoe of Ireland, Stapleton, Pryor & Pascoe, P.C., Denver, Colo., on the briefs, for plaintiffs-appellees/cross-appellants.
 Robert L. Morris and P. Kathleen Lower of Morris, Lower & Sattler, Denver, Colo., and Steve H. Ozawa of KN Energy, Inc., Lakewood, Colo., on the briefs, for defendant-appellant/cross-appellee.
 Before MOORE and McWILLIAMS, Circuit Judges, and BRATTON, District Judge.*
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 In this case, we turn our attention to issues not addressed in a prior opinion in which we dismissed the action on jurisdictional grounds. McMoran Oil and Gas Co. v. KN Energy, Inc., 907 F.2d 1022 (10th Cir.1990), rev'd, --- U.S. ----, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991). On the merits, McMoran Oil and Gas Company and its parent company, FreePort-McMoRan, Inc., (McMoRan collectively) and KN Energy, Inc., (KN or Buyer) now challenge the district court's interpretation of an amendment to the parties' gas purchase contract. KN raises additional evidentiary errors. We reverse and remand in part and affirm in part.
 
 I. Background
 
 2
 In 1973, to insure against shortages in its supply of natural gas, KN, an interstate pipeline company, executed a gas purchase contract (the 1973 Contract) with a predecessor of McMoRan[1] in which the producer agreed to develop 475,000 acres of a gas field in the Bowdoin Unit, Phillips and Valley Counties, Montana, and to dedicate that production exclusively to KN for the life of the field. The 1973 Contract established a price of 50cents per thousand cubic feet (MCF) to be increased at the end of each succeeding contract year by 1cents/MCF.
 
 
 3
 In 1975, the 1973 Contract was amended (the 1975 Amendment). In exchange for adding 123,000 acres to the originally dedicated field, McMoRan acquired the right to request renegotiation of the purchase price if Congress deregulated natural gas. (Exh. 2). In addition, p 8.1F of the 1975 Amendment permitted McMoRan to request renegotiation every three years after the first renegotiated price became effective. During the interim three years of each renegotiation period, the price "shall increase one (1cents) per thousand (1,000) cubic feet until the effective date of each subsequent redetermined price."
 
 
 4
 Later, as a consequence of the newly enacted Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. §§ 3301-3432, and the substantially changed relationship between McMoRan and KN,[2] KN notified McMoRan that upon deregulation, it would pay 62cents/MCF, although it had previously paid a higher price for the same production. McMoRan responded by demanding the proper price be paid and later notified KN it would exercise its right to renegotiate the price as provided in p 8.1F of the 1975 Amendment. According to McMoRan, the highest price "then being paid" for natural gas in the Bowdoin Area was the NGPA maximum lawful price for § 108 gas[3] "as determined from month-to-month based upon inflation and real growth factors and including tax reimbursement." (Exh. 28).[4] KN later responded under p 8.1F, the "highest price" referred to the February 1985 "highest deregulated price" under § 103(b)(1)[5] of the NGPA or $2.96/MCF.
 
 
 5
 This diversity action for breach of contract followed.[6] McMoRan sought declaratory relief to determine the appropriate renegotiated price under p 8.1F and damages for past underpayments. After a two-day trial, the district court ruled from the bench that the " 'highest price' means highest price and that 'highest price being paid for interstate or intrastate sold--similar quantities and qualities and being sold under similar terms and conditions: does not distinguish between regulated gas and unregulated gas." (R. VI, 9). The court found "the highest price then being paid was the regulated February, 1985 price," id. at 11, or $4.16.6/MMBTU, subject to an annual increase of 1cents/MMBTU. On that basis, the court ordered KN to pay to McMoRan $1,602,712.51, plus costs, for past underpayments.
 
 
 6
 McMoRan and KN cross appeal this order. McMoRan contends the court erred in not finding the § 108 escalating price "the highest price then being paid" and in failing to permit a 1988 step-up of that price as provided in p 8.1F but not requested because of the still pending litigation.[7] KN urges error in the court's use of a regulated price as the highest price for deregulated gas. KN also complains the district court undercut its presentation of evidence by excluding certain testimony as well as other contracts to controvert McMoRan's case.
 
 II. Deregulation Redetermination Clause
 
 7
 As the district court correctly noted, this is a contract case in which we muster all of the tools of contract interpretation to decide what the parties meant and intended to do in p 8.1F of the 1975 Amendment. This provision states:
 
 
 8
 In the event the Federal Power Commission or any successor governmental body shall cease during the term hereof to regulate the price to be paid hereunder, then within six months after such occurrence Seller shall have the right to request a renegotiation of the price to be paid hereunder. If Seller so requests a renegotiation of the price, Seller and Buyer shall determine the highest price then being paid for natural gas by interstate or intrastate pipeline companies in Phillips or Valley Counties, Montana, for gas of similar quantity and quality and being sold under similar terms and conditions. The price so determined shall be come [sic] effective upon the first day of the month six months after the date of cessation of price regulation. If said renegotiated price is put in effect, then three (3) years after the cessation of price regulation and every third year thereafter, Seller shall have the right to request a further renegotiation of the price to be paid hereunder. Each price so determined shall remain in effect for a period of one year, and at the beginning of each succeeding yearly period the price shall increase one (1cents) per thousand (1,000) cubic feet until the effective date of each subsequent redetermined price.
 
 
 9
 (Exh. 2) (emphasis added).
 
 
 10
 In oil and gas parlance, p 8.1F embodies a type of escalator clause[8] tying a price renegotiation or an escalation in the contract price to the specific event of the deregulation of natural gas. The first sentence of p 8.1F gives the Seller, McMoRan, the exclusive right to request a renegotiation of its sales of natural gas to KN "in the event" of deregulation. The second sentence is an area rate provision permitting an increase in the price of gas to equal "the highest price then being paid ... in Phillips or Valley Counties, Montana, for gas of similar quantity and quality and being sold under similar terms and conditions." (emphasis added).
 
 
 11
 How to determine "the highest price then being paid" remains the rub of this litigation. Although there was uncontested evidence on the meaning of "similar quantity and quality,"[9] the parties disagreed on the import of "sold under similar terms and conditions." Relying on Superior Oil Co. v. Western Slope Gas Co., 604 F.2d 1281 (10th Cir.1979), the district court concluded that whether gas is regulated or deregulated does not comprise a condition of sale. Instead, conditions of sale, established in Superior Oil, referenced the "physical characteristics" of natural gas involved in a particular sale, for example, compression, deliverability, and treatment of the gas. (R. VI, 9).
 
 
 12
 However, this is a different case employing terminology not addressed by Superior Oil. In Superior Oil, the issue was whether vintaging,[10] a designation specifically used by the Federal Power Commission (FPC) in Area Rate Proceedings, is a "condition of sale" as that phrase was used in the favored nations clause[11] included in the parties' gas purchase contract. The Superior Oil court held it was not, unpersuaded that "well-drilling dates (vintage) constitute such 'attributes' or 'characteristics,' since there is no difference between 'old' and 'new' gas for distribution or consumption purposes." Id. at 1291. Instead, Superior Oil stated, "conditions of sale" included those physical characteristics of natural gas, compression, deliverability, treatment of the gas, peaking capacity, as contemplated by the parties. Key to this conclusion was the considerable evidence of the parties' clear intention in drafting this provision to "not come under FPC control--at least insofar as gas purchased under the contract is concerned." Id. at 1289.
 
 
 13
 Thus, although Superior Oil assists in our analysis, the present case is distinguishable not only in the words used in p 8.1F but also in the intention of the parties as manifest by that language. The gas to be sold under p 8.1F was that sold both under similar terms and under similar conditions.
 
 
 14
 Before we consider extrinsic evidence to understand this language, we must look first to the meaning of the words themselves. In p 8.1F, the use of the word "terms" is separate and distinct from that of "conditions." Indeed, the use of "terms" in this phrase is peculiar to the nomenclature of contract law and not a synonym nor interchangeable with "conditions." "A term of a contract is that portion of the legal relations resulting from the promise or set of promises which relates to a particular matter, whether or not the parties manifest an intention to create those relations." Restatement (Second) of Contracts § 5 (1981).[12] Such an agreed upon term, then, was the event of deregulation, and that was the only event which gave rise to McMoRan's right to seek a new price. Moreover, the clause intends deregulation to figure into the determination of the "highest price then being paid." This was a "term" of the sale.
 
 
 15
 The testimony established this provision was drafted in anticipation of price deregulation, with each party giving up certain consideration to implement the repricing mechanism.[13] The resulting natural gas price established by p 8.1F was intended to exist only in a deregulated arena. While this deregulated setting may not be a "condition" of sale, it was contemplated as a "term" of sale. The "highest price then being paid" was for gas "sold under similar terms and conditions."
 
 
 16
 Given this reading, the "highest price then being paid" must be pegged to the highest free-floating market price under deregulation in Phillips or Valley Counties, Montana, existing at the time of renegotiation. Hence, the highest price under the terms of this contract cannot be "the frozen price" of § 108 gas, incentive-priced stripper gas not subject to deregulation.
 
 
 17
 Similarly, the highest price according to the language of this provision cannot be the highest escalating price as McMoRan urges. Paragraph 8.1F ties price to an area rate concept as the mechanism for escalation. This link is not an anachronism, as McMoRan contends, but reflects the intent of the parties faced with the prospect of deregulation. While the price to be set may reflect market fluctuations at agreed upon intervals, p 8.1F contemplates incorporating the concept of escalation into an ultimately fixed price. To read price as that term is used in p 8.1F as "pricing formula," as McMoran urges, injects a meaning that is neither supported by the plain language nor the parol evidence relied upon to interpret this provision.
 
 
 18
 The parties stipulated that in December 1984 under the 1973 Contract, "KN paid $4.118/MMBtu for dually qualified Section 102/108 gas[14] and $3.845/MMBtu for singly qualified Section 102 gas.[15] On January 1, 1985, both singly qualified Section 102 gas and dually qualified Section 102/108 gas became deregulated."[16] Dr. Talley testified based on the Foster's Bulletin on Deregulated Gas, prepared from the Purchase Gas Adjustment Filings of interstate pipeline companies that the "average price being paid in the Bowdoin field for NGPA 102 deregulated gas purchases was $3.18 to $5.49.2/MMBTU." (R. IV, 54-55).[17] The highest price being paid in the area under a natural gas contract, Dr. Talley explained, was the § 108 escalating price. (R. IV, 56). The escalating § 108 price was $4.16.6/MMBTU in February 1985, and $5.37/MMBTU in October 1988.[18] However, the § 108 escalating price can only apply to gas specifically qualifying as § 108 gas. Pennzoil Co. v. FERC, 645 F.2d 360, 377, n. 32 (5th Cir.1981), cert. denied, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). It cannot establish the price for all deregulated gas. Id.
 
 
 19
 The record discloses that the wells involved in the Bowdoin field included § 102, § 102/108, and § 108 wells. Although the parties stipulated to the December 1984 prices in the pretrial order, we cannot discern precisely from this record whether the stipulated price changed in February 1985 for deregulated § 102 and § 102/108 gas. Thus, we must remand this inquiry to the district court to make additional findings consistent with this opinion.
 
 
 20
 However, the district court was correct in finding p 8.1F fixed that price for a period of three years after deregulation at which time McMoRan could again exercise its right to request a renegotiation.[19] During the three-year interval, p 8.1F provides a one cent, 1cents/MCF, increase "until the effective date of each subsequent redetermined price."
 
 
 21
 Despite this language, McMoRan challenges the court's refusal to allow the court-determined price to be " 'stepped up' to the Section 108 price as of June 30, 1988, the end of the second redetermination option." McMoRan concedes it did not make a timely written request as required by p 8.1F but insists the equities of the situation would override such a "rigid enforcement of the contractual condition."[20]
 
 
 22
 However, in p 8.1F, the parties intended to create a mechanism for setting and controlling the price of gas in the event of deregulation. By combining an escalation clause with a fixed price/fixed increase provision, as well as the procedure for triggering the price renegotiation, McMoRan and KN attempted, as the district court found, to maximize the incentives for which each bargained. Central to that contractual design is McMoRan's right to renegotiate. That right, the parties agreed, was triggered by McMoRan's request. The district court could neither anticipate McMoRan's making this request in 1988 nor do it for them. We find no abuse of discretion in the court's declining to modify the decree to provide for a 1988 renegotiation.
 
 
 23
 Finally, KN complains the court abused its discretion in refusing to add two defense witnesses and an exhibit shortly before trial was scheduled to commence.[21] The transcript of this motion hearing on October 7, 1988, reveals the court thoughtfully balanced KN's proffer with McMoRan's showing of prejudice within the context of an inexorable trial schedule that had already significantly delayed the resolution of this action. Furthermore, despite the exclusion of this specific evidence, the court tempered the ruling by offering KN "leeway to present whatever evidence you need to present concerning what happened in the negotiations at the time of this contract and why language was changed and why it was added." (R. II, 16). There is, thus, no foundation in the record on which we can predicate an abuse of discretion.
 
 
 24
 We, therefore, REVERSE and REMAND the case for the sole purpose of determining the proper price as provided by p 8.1F for deregulated § 102 and § 102/108 natural gas in February 1985 consistent with this opinion. We AFFIRM the court's order in all other respects.
 
 
 
 *
 The Honorable Howard C. Bratton, Senior Judge, United States District Court for the District of New Mexico, sitting by designation
 
 
 [1]
 The 1973 Contract was executed with Midlands Gas Corporation, a wholly-owned subsidiary of KN, set up to explore and develop natural gas reserves. In 1983, KN created another subsidiary, Midlands Energy Company, to which the 1973 Contract was assigned. In the course of various acquisitions and exchanges of Midlands stock and in the face of a possibly unfriendly take-over, FreePort-McMoRan, Inc. (Freeport), McMoRan's parent company, acquired Midlands along with the 1973 Contract covering the Bowdoin Field. In 1985, McMoRan assigned the 1973 Contract to FMP Operating Company (FMPO), a limited partnership in which McMoRan and Freeport are general partners. In 1987, McMoRan amended its complaint to substitute FMPO as a plaintiff under Fed.R.Civ.P. 25(c), and McMoRan remained a party in the action. Thus, although FMPO is the real party in interest for purposes of the judgment and appeal, we shall continue to designate the original plaintiff as McMoRan to preserve a semblance of clarity in this case
 
 
 [2]
 McMoRan alleged that once KN's management sold its stock and spun off Midlands, KN, no longer negotiating as parent with a subsidiary, changed its position on price
 
 
 [3]
 Section 108 deals with stripper well gas. A stripper well produces such a small volume that its gross income "provides only a small margin of profit or in many cases, does not even cover actual cost of production." 8 H. Williams & C. Meyers, Manual of Oil and Gas Terms 947 (1987) (hereinafter Manual of Oil and Gas Terms ). Under the NGPA, to be qualified as § 108 gas, in most cases, production cannot exceed 60 MCF/per day. In contrast, a high volume well could produce from two to ten/Mmcf per day. (R. IV, 62). Under the NGPA, § 108 gas was not deregulated and remained incentive priced
 
 
 [4]
 In February 1985, FERC's published § 108 price was $4.16.6/MBTU
 
 
 [5]
 Section 103 designates gas from new onshore production wells
 
 
 [6]
 All additional claims were settled before trial
 
 
 [7]
 Trial of this action was considerably delayed by the court's pressing criminal docket
 
 
 [8]
 Williams & Meyers reference six types of escalator clauses found in gas purchase contracts of which the renegotiation clause is one. "The 'renegotiation' ... clause generally provides that at stated intervals--two, three, four or five years--there shall be a renegotiation or redetermination of the contract price based upon the current prices then being paid in the field." Manual of Oil and Gas Terms 317
 
 
 [9]
 The parties stipulated in the Revised Pretrial Order, "The gas to which the redetermined price under the Midlands-KN contract applies is similar in quality to all other gas purchased by KN in February 1985 under that contract." Dr. William Talley, plaintiffs' expert, testified without contradiction that the designation of " 'similar quantity' was included ... to prevent a spurious contract for a very small quantity of gas from being used to set the price for contracts--other contracts; so it was a defining term to prevent abuse of this--under this clause." (R. VI, 60)
 
 
 [10]
 Vintaging refers to the date on which a well is drilled
 
 
 [11]
 A favored nation clause is a type of area rate clause "increasing the price to be paid for natural gas by a purchaser to the seller-producer if any producer in the field receives a higher price for his gas than that stipulated in the contract." Manual of Oil and Gas Terms 574
 
 
 [12]
 The Comment to § 5 states:
 (a) Agreed terms. The terms of a promise or agreement are those expressed in the language of the parties or implied in fact from other conduct. Both language and conduct are to be understood in the light of the circumstances, including course of dealing or usage of trade or course of performance ... If a promise is binding, a term of the promise becomes a term of the contract unless it is rendered inoperative by some rule of law.
 Restatement (Second) of Contracts § 5 (1981).
 
 
 [13]
 In return for KN's giving McMoRan the right to request a renegotiation of price, McMoRan added 123,000 acres to the reserves already dedicated exclusively to KN for the life of the field
 
 
 [14]
 Section 102/108, "dually qualified gas," is deregulated under the NGPA
 
 
 [15]
 Section 102 new gas was deregulated
 
 
 [16]
 The parties also stipulated that the proper redetermined price is no less than the February 1985 NGPA § 103(b)(1) ceiling price, $2.96/MMBTU. Although the record discloses that KN paid a § 103 price under some contracts, we find no evidence to consider this figure under the contract at issue
 
 
 [17]
 Dr. Talley corrected this statement upon realizing the figures covered the total Rocky Mountain area
 
 
 [18]
 Under the NGPA, the annual escalation was to apply indefinitely to § 108 gas. Other categories of gas had limitations placed on the duration of their annual escalations. See Natural Gas Regulation Handbook, ch. 3, at 46 (R. Pierce, Jr., ed. 1980)
 
 
 [19]
 Paragraph 8.1F states in part: "If said renegotiated price is put in effect, then three (3) years after the cessation of price regulation and every third year thereafter, Seller shall have the right to request a further renegotiation of the price to be paid hereunder."
 
 
 [20]
 McMoRan relies on its record of vigorously pursuing this lawsuit in the face of the district court's scheduling problems
 
 
 [21]
 The testimony was offered to elucidate the source of the language contested in the 1975 Amendment and the negotiations related to that language in a contract with Odessa Natural Corporation